## Baughman v. Commonwealth.

(Decided December 19, 1924.)

### Appeal from Fayette Circuit Court.

1. Criminal Law—Weapons Discovered by Statements of Accused During Involuntary Confession and Statements Relative Thereto Admissible.—Constitution, section 11, providing that accused shall not be compelled to give evidence against himself, and Anti-Sweating Act (Kentucky Statutes, sections 1649-1 to 1649-4), excluding involuntary confessions, held not to render incompetent evidence of discovery of weapon used by accused at place disclosed in his involuntary confession, or all that he said or did in conveying such information.

2. Infants—County Judge Held to have Jurisdiction to Bind Over Infant Defendant for Prosecution for Homicide.—Proceedings before county juvenile court, resulting in county judge binding infant defendant over to grand jury for prosecution for homicide, held not invalid for want of jurisdiction.

3. Infants—Failure to Furnish Copy of Order Held Not to Affect Circuit Court's Jurisdiction.—Where juvenile court had actually made order transferring prosecution of infant charged with murder to circuit court, failure to furnish that court or its prosecuting officer with copy of order prior to return of indictment was not fatal to circuit court's jurisdiction.

4. Infants—Immaterial Irregularities in Proceedings Binding Infant Over to Grand Jury Held Not Ground for Reversal.—Order of county judge binding infant defendant to grand jury for prosecution for murder was not void because judgment was entered in

record of quarterly court, the word "quarterly" having been stricken, and the word "county" substituted, and because clerk of quarterly court and not clerk of county court actually transcribed judgment.

5. Infants—That County Judge Kept Book in which Order Binding Infant Over to Grand Jury was Entered Held Not to Affect Validity.—That book in which was entered order of juvenile court, binding infant charged with murder to grand jury, was not delivered to custody of county court clerk, but was kept by county judge in his office, did not affect validity of the proceedings.

6. Witnesses—Testimony of County Judge from Record of Proceedings Holding Infant to Grand Jury Held Competent.—In prosecution of infant for homicide proof by county judge testifying from record of proceedings in which he bound infant over to grand jury, held competent, notwithstanding the usual mode of proof is by certified copy made by lawful custodian.

GEORGE HUNT MITCHELL, DAVID C. HUNTER and JAMES R. BUSH for appellant.

FRANK E. DAUGHERTY, Attorney General, GARDNER K. BYERS, Assistant Attorney General, and MAURY KEMPER for the state.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellant, Joseph Richard Baughman, a colored boy between 16 and 17 years of age, was convicted in the Fayette circuit court of murdering George I. Pierson, and his punishment fixed at death. The court overruled his motion for a new trial and he has appealed.

The evidence, independently of that objected to and hereinafter considered, unmistakably establishes the defendant's guilt, and it is uncontradicted, since the defendant neither testified nor introduced any witness to prove his innocence, either to show that he did not commit the deed, or that if he did so he was for any reason not responsible therefor. So that, it becomes unnecessary for us to rehearse the testimony more than to say that the deceased was a merchant near Greendale, in Fayette county, and in the rear of his store he slept and prepared his meals in compartments equipped for the purpose. Some time after seven o'clock on the evening of February 11, 1924, deceased and defendant were left in the store, as is shown by a witness who was the last person to see Pierson alive, and at that time he was preparing to close his store when defendant suggested that he wished to buy some candy; and he and the deceased went or started back into the store for that purpose and the

witness departed. Early the next morning the dead body of the deceased was lying at the front end of the store behind a counter with a bullet hole in his head, it having passed through his hat band, and was made with a number 22 ball. Later on that evening, and something like an hour after the closing of the store, a witness saw defendant walking on the pike from that place towards Lexington. Defendant made his way on that night to Danville where he found his brother, who lived in Lincoln county, attending a colored dance with some companions. Defendant went home with them after the dance to Stanford, Kentucky, and there confessed to his brother and another that he had killed a man the night before. The next day he went to the home of some relatives in that county and was later arrested and brought to the jail at Stanford, where some officers of Fayette county came for him at about 2 o'clock on the morning of February 13. One of the deputy sheriffs, who was along, was guilty of some very brutal treatment of defendant inflicted during the course of interrogating him about the crime, and for which the maximum punishment applicable to that conduct should be meted out to that officer.

Defendant was taken back to Lexington and seems to have become both friendly and confiding to another officer of Fayette county, who according to the record had treated him kindly and considerately. To that officer, along about 3 o'clock p. m. of the 13th of February, defendant made a confession in which he told that the rifle with which the deed was done was in a certain field a short distance from the pike and not far from the store where the homicide was committed, and at a point between that store and the place where a witness met defendant on the pike, as we have hereinbefore stated. He also stated in that confession, or another one made under the same circumstances, that a pistol known and proven to have been owned by the deceased was at a certain place in Lincoln county and he expressed a willingness to go with the officer or officers to those two places to recover those weapons. He did do so and both the rifle and the pistol were found at the places where defendant stated they were. A farmer living near Greendale, with whom defendant had been working, testified that he sold to the former a 22 rifle a short time before the homicide, and he positively identified the one found as being that rifle. There were other strong incriminat-

ing circumstances and testimony pointing unerringly to the defendant's guilt, and there can be no doubt as to who committed the crime, even, as we have stated, if the facts of. finding the weapons were entirely eliminated from the case.

Defendant is shown not to possess the strongest intellect for one of his age, and he is shown to have been somewhat subnormal in that respect, although physicians who examined him for the purpose testified that he conversed. with them readily and intelligently, and they expressed their opinion that he had intelligence enough to be responsible to the law for his criminal acts. Other testimony in the case substantiates that of the professional witnesses, and, indeed, there is no contrary contention in this case. The instructions of the court are not complained of, and the only points urged for a reversal are: (1), That the court erred to the prejudice of defendant in admitting the testimony with reference to the discovery of the rifle and the pistol, and (2), that it was error to overrule defendant's special demurrer to the proceedings and his motion to dismiss the prosecution upon the ground that the court did not have jurisdiction of it. We will dispose of these contentions in the order named.

1. The first contention is bottomed on section 11 of our Constitution saying in part that, "He (the accused) cannot be compelled to give evidence against himself;" and on sections 1649b-1-1649b-4, both inclusive, of our present statutes, commonly known as the "Anti-Sweating Act." Before determining either of those objections, it will be appropriate to observe the precise matter complained of. The court heard the confession in the absence of the jury and declined to permit any of it to be introduced. However, he did permit the Commonwealth to show that defendant stated the places where the rifle and the pistol might be found, and the fact that they were found at those places, but did not allow the witnesses to testify that defendant stated that he had placed them at those places. The only fact, then, that the jury was permitted to hear was that defendant stated where the weapons might be found and that statement was afterwards corroborated by the actual finding of them at those places. In confining the testimony within the limitations stated, the court necessarily found that the confession was made under such circumstances as to exclude

its introduction under the anti-sweating statute, and for the purposes of this case we will assume that to be a fact. The question then is, what are the facts that may be considered as component parts of the *confession* so as to render them incompetent under any ground disallowing its introduction? To be more explicit, the question is whether what is ordinarily denominated a confession is confined to the narrations of the defendant as to what took place at the time and place of the commission of the offense with which he is charged; or, does it also include any collateral and extraneous facts which he might state in the same conversation but which occurred later at a different time and at a different place from the scene of the crime? If the latter class of statements are not properly included in the scope and strict definition of a confession and are, therefore not protected under any rule forbidding their introduction, then the action of the court was correct, and it would not be necessary to consider other points raised and discussed. Some cases hold, as above indicated, *i. e.,* that such collateral and extraneous facts form no part of the confession proper and are not protected by any law, statutory or otherwise, forbidding the introduction of involuntary confessions. We have concluded, however, to pass that question without determining it, since we are of the opinion that the admission of the complained of evidence was proper for the reasons hereinafter stated.

It is our conclusion that the defendant under the facts may not invoke the constitutional provision relied on, since *it* seems to have been interpreted as applying to a *witness* in a judicial or *quasi* judicial proceeding, and not to a confession made outside of such a proceeding and commonly known as an "extrajudicial" one. Mr. Jones in his excellent commentaries on Evidence, volume 5, section 884, in speaking of the scope, purpose and intent of such constitutional provisions, says. "These provisions are generally held to be. *declaratory of the common law rule,* neither limiting nor enlarging it. The protection applies not only to parties accused, but to *witnesses,* and in all kinds of proceedings where testimony is to be offered, civil as well as criminal." See also 28 R. C. L. 423, wherein the text says: "No principle of the common law is more firmly established than that which affords to a *witness* the privilege of refusing to answer any question that will criminate himself. As the common law had it, *nemo tenetur se ipsum accusare.*·

This principle finds expression in the constitutions of many states and in the fifth amendment to the federal constitution.'' The immediately following pages, while not expressly saying that the constitutional protection would not apply to an extrajudicial confession, they do *impliedly* so state it as the correct interpretation in giving the history of the common law rule, of which the constitutional provision is but declaratory, by showing that such provision applies to a *witness,* which of course applies to the defendant, if the prosecution attempts to compel him to testify against his will, but not so, if he voluntarily offers himself as a witness, in which case he cannot claim the privilege as to facts connected with the crime on trial. In treating of the character of proceedings in which the privilege may be claimed, the text on page 425 says: ''The authorities are practically unanimous, both at common law and under constitutional provisions substantially declaratory of the common law, that the privilege of a *witness* not to give self-incriminating evidence is not limited merely to criminal prosecutions wherein the witness is the defendant but can be invoked in any *judicial proceeding;* and this is generally held even under constitutional provisions that no person shall be compelled in any criminal case to be a witness against himself.'' And on the next page (426), in stating who may take advantage of the privilege, it is said: ''The privilege of a *witness* to refuse to testify on the ground that his testimony may incriminate or tend to incriminate him is strictly personal.'' Again on page 428, in treating the subject under the subtitle ''Form of Protection,'' it is said: ''Although a *witness* cannot be compelled to give self-incriminating testimony, he must appear and be sworn; his privilege is available to him only as a witness, and cannot be extended so as to excuse him from appearing.'' Discussing the same subject, the text in 40 Cyc. 2537 says: ''In the United States the privilege of refusing to incriminate one's self is guaranteed by a provision of the federal constitution, which is also incorporated in substantially the same form in most, if not all, of the state constitutions, that no person shall be compelled in any criminal case to be a *witness* against himself. The manifest purpose of these provisions is to prohibit the compelling of evidence of a self-incriminating kind from a *witness,* and they should be applied in a broad and liberal spirit, in order

to secure to the citizen that immunity from every species of self-accusation implied in the language in which they are expressed." (Our italics.)

There may be a few isolated opinions that extend the privilege given by such constitutional provisions, so as to include involuntary extrajudicial confessions; but the great weight of authority confines the privilege to a *witness,* either for himself (with the exception, *supra*) or for another in some sort of judicial or *quasi* judicial investigation, wherein it sought to compel him against his will to give testimony that might incriminate him, and which would include grand jury investigations, coroner's inquests, statutory inquisitions, and other investigations by functionaries having the right to swear and interrogate witnesses, the same as in a judicial tribunal established for the trial of causes. That being true, we must look to some other source for the protection of a defendant against involuntary extrajudicial confessions.

In a less humane period of English history all sorts of torture were administered to the accused in order to exact a guilty confession from him. It was frequently done, not only by officers, but by ecclesiastical and other voluntary inquisitions, having no foundation in the law, and the practice became so intolerable that the courts took cognizance of it. As a consequence the modern rule excluding confessions obtained by duress, coercion, threats, promises of reward, or other means, denominated unlawful, became the settled practice. The principal foundation for the rule of exclusion of such confessions was the fact that the defendant, because of the unlawful means applied to him, may have confessed to a falsehood and that his confession was the result of the means applied to him rather than because it was the truth. No doubt another ground was to judicially condemn the barbarous and inhumane methods employed to obtain the confession. See 1 R. C. L. 551-2, paragraph 100. Other authorities confirm the history of the rule, as above given, and it will be unnecessary to insert them here.

Mr. Bishop, in his New Criminal Procedure, second edition, vol. 2, subsection 4 of section 1217, in stating the doctrine as to the nonadmissibility of involuntary extrajudicial confessions, says: "The doctrine, in its essence and divested of its technicalities, is that a defendant's

confession is admissible in evidence against him if made freely and without the hope of benefit to his cause; otherwise it is rejected, since its purpose may have been to secure such benefit rather than to disclose the truth." And that ground for their exclusion seems to be the teaching of all writers upon the subject, as well as courts in applying it. It, therefore, becomes necessary to determine whether, if the reason for the rule of exclusion ceases, by the proof of such facts as demonstrably destroy it, the rule should also cease as to such demonstrated facts which emanated from and issued out of the confession and which are collateral and extraneous to it?

In applying the common law rule, in the absence of an anti-sweating or other kindred statute, courts generally admitted such collateral or extraneous demonstrated facts, although they were obtained as a result of some statement made in the involuntary confession. Thus, in 16 Corpus Juris 731, the text on the point says: "Where an involuntary confession discloses incriminating evidence which subsequently on investigation is proved to be true, or where the confession leads to the discovery of facts which in themselves are incriminating, so much of the confession as discloses the incriminating evidence and relates directly thereto, but not the confession in toto, is admissible; and the facts discovered in consequence of such involuntary confession may be proved. Thus in a prosecution for murder evidence of the discovery in a certain place of the remains, money, or clothing of the deceased, or of the weapon by which he was killed, with so much of an involuntary confession as relates directly to such facts, is admissible. And in a prosecution for burglary or larceny that portion of the involuntary confession of accused disclosing the hiding place of the stolen property, and all that he says or does in conveying the information which is directly connected with the discovery, is admissible, although his statement that he stole such property may be inadmissible."

In 8 R. C. L. 196, paragraph 192, in stating the rule as to the admissibility of such facts, notwithstanding they were discovered through an inadmissible confession, it is said: "If one accused of crime in making an involuntary confession makes statements of extraneous facts, and, in consequence of the information thus obtained from him, any material fact is discovered, it may be shown that the discovery was made conformably with

such information." See also State v. Turner, 82 Kan. 787, 136 A. S. R. 129, 32 L. R. A. (N. S.) 722; vol. 1, Greenleaf on Evidence, section 231; Jane v. Commonwealth, 2 Met. 30; Commonwealth v. Philips, 26 Ky. L. R. 543; Rector v. Commonwealth, 4 Ky. L. R. 323; McQueen v. Commonwealth, 196 Ky. 227, and a number of cases from foreign jurisdictions in the notes to the inserted text from Corpus Juris and R. C. L.

It will, therefore, be seen that the constitutional provision protects the privilege of the accused on trial from the accusatory effects of an involuntary judicial confession made by him as a witness, while the common law rule referred to, and statutes in enlargement thereof, protect such privilege as to involuntary extrajudicial confessions; but as to the latter, the rule has been evolved that extraneous statements as to collateral facts which are afterwards corroborated by demonstrative evidence, the privilege will not extend, and such demonstrated facts may be admitted against the accused unless a statute enlarging or modifying the common law rule is sufficiently explicit in its terms to exclude such demonstrated facts. Whatever, therefore, may be the ground for admitting such facts as to extrajudicial involuntary confessions, and whatever may be said as to its absolute soundness at the beginning, it is now too late for us, after generations of its adoption and application, to attempt to overthrow it or to announce a different rule; which brings us to a secondary contention made by learned counsel for appellant, that our anti-sweating statute is broad enough to render the testimony in this case which led to and the fact of, the discovery of the weapons incompetent.

In order to sustain that contention, we would be compelled to overrule the McQueen case, the principles of which, as declared in the opinion, are identical with the ones involved here. We have given our anti-sweating statute a thorough reconsideration in this case and have concluded that the intention of the legislature in enacting it was to only enlarge the list of involuntary confessions that were excluded under the common law rule. Prior to the enactment of that statute, many of the acts, denominated therein as "sweating," were not forbidden, and confessions obtained thereby were considered as voluntary, and, therefore, admissible; whereas the statute enacted that they should thereafter be con-

sidered as involuntary, and, therefore, inadmissible. Numbers of cases could be cited wherein a confession obtained by an officer having charge of the arrested prisoner, if not coerced from him, were regarded as voluntary. But, since the enactment of the statute, a confession so made by plying the prisoner with questions, threats or other wrongful means, are classified as involuntary, and will not be admitted. But we find nothing in the statute authorizing the interpretation that it was the intention and purpose of the legislature to exclude any extraneous facts that were subsequently corroborated in the manner hereinbefore stated and which the common law, before the enactment of the statute, regarded as competent. The McQueen case so construed our anti-sweating act, and after this second consideration of it, we are not inclined to depart from that construction. We, therefore, hold that the court did not err in admitting the evidence objected to. If, however, it had done so, the question would then be presented whether the evidence was sufficintly prejudicial, in the light of the other conclusive proof of defendant's guilt, to authorize a reversal of the judgment. Since, however, we have found that the court did not err in admitting the testimony, we refrain from passing on that question, which brings us to contention (2), above.

2. The second and last contention urged is that, defendant being a juvenile delinquent, the Fayette circuit court did not acquire jurisdiction of the prosecution in the manner pointed out by us in the cases of Commonwealth v. Franks, 164 Ky. 239; Talbott v. Commonwealth, 166 Ky. 659; Commonwealth v. Davis, 169 Ky. 681; Waters v. Commonwealth, 171 Ky. 457, and Compton v. Commonwealth, 194 Ky. 429. In those cases it was held that, under our juvenile statutes, circuit courts cannot initiate prosecutions against juvenile delinquents, but that they should first be apprehended by and a hearing had before the county juvenile court, who is the county judge, and that not until that court had recommended a prosecution in the circuit court would the latter acquire jurisdiction. Before the indictment was returned in this case, proper proceedings under the juvenile statute were instituted before the county judge after the requisite notice and other preliminary steps for that court to acquire jurisdiction of the delinquent. It appears that the court heard the case and determined that it was one that

should be prosecuted in the circuit court, and adjudged that defendant "be held to await the action of the Fayette county grand jury without bond, and this court in the exercise of the discretion conferred upon it by the laws of the Commonwealth of Kentucky in such cases made and provided and transferred the defendant herein and this case to the Fayette circuit court, and asks that said court proceed with this action, and against the defendant herein in accordance with the laws in force in the state governing the commission of crime and expressly waives any further jurisdiction of the case, and requests the Fayette circuit court to assume jurisdiction of the same." And, it was after that order so made by the county judge, purporting at least to sit as a juvenile court, that the indictment was returned.

We do not understand that serious criticism is made of the form of the order made by the county judge and, as stated, neither is there criticism of the steps taken by him to acquire jurisdiction of the defendant as a juvenile delinquent; but even if such objections were made, we can find no ground to sustain them. It is insisted, however, that the county judge had not actually transferred or delivered his order to the Fayette circuit court before the indictment was returned, but the order of transfer of the defendant and his prosecution to that court had actually been made; and it is our conclusion that it would be surrendering the substance to the shadow to hold that the failure to furnish the circuit court or its prosecuting officer with a copy of the order, although as a matter of fact it had been made and entered, was fatal to the circuit court's jurisdiction, and we find nothing in the opinions, *supra,* either expressly or by implication, sustaining such a conclusion.

The text in 31 Corpus Juris, 1106, in stating the measure of compliance with such statutes in order for the proceedings to be valid, says: "Although the proceedings are in a measure informal, and, if the order is authorized, mere irregularities will not invalidate it, yet the proper elements of a judicial proceeding should be present, such as, for instance, notice, opportunity to be heard, hearing upon evidence, and an order or decree." We, therefore, conclude that it is not the fact that the circuit court is *in possession* of the copy of the order that gives it jurisdiction, but rather the fact that the proper order *had been made* so as to give it jurisdiction.

But it is further urged that the county judge, when he made the order referred to, was not sitting as a juvenile court, since he appears to have held the investigation in the quarterly court room, and entered his judgment in a book which had printed on it "The Fayette Quarterly Court," but the word "quarterly" was stricken therefrom and substituted with the word "county," so that as altered the book was designated as a record of "The Fayette County Court." It is furthermore insisted that the clerk of the quarterly court actually transcribed and wrote the judgment on the described order book when, as claimed, it was the duty of the county court clerk to do so. But, surely, the validity of the proceedings could not be made to depend upon such an immaterial circumstance. It was shown that the judgment was written at the instance, and perhaps the dictation, of the Fayette county judge, and of course it was subscribed by him, and we think that was a substantial compliance with the statute in making the juvenile record, which is all that is required, as is shown by the text in Corpus Juris, *supra*, 1105-6, in paragraph 231, under the subhead, "Compliance with Statute." We cannot, therefore, see any substantial reason for holding that the proceedings were void because of the fact that the record was not actually written or entered by the county court clerk, whom the statute makes the clerk of the juvenile court and the custodian of its records, but by another at the instance and suggestion of the court itself. Suppose the judge of the court had himself written his order and subscribed it, as he did in this case, could it then be said that the record was invalid because not actually written by the county court clerk? We think not, for such a holding would be extending the rule of technical compliance to an unwarranted extreme and subject our action in doing so to just criticism.

We are also of the opinion that another criticism made by learned counsel is equally without merit. It is, that the book in which the order was made was not delivered into the custody of the county court clerk, but was kept by the county judge in his office. Whether it was his purpose to later deliver it to the county court clerk is not shown, but certainly the latter officer was not forbidden to possess himself of it at any time he desired. It was under the general control and supervision of the county judge who by the statute is the juvenile court,

and, for the same reasons above, we are convinced that we would not be warranted in rejecting the proceedings before the county judge as invalid because of this highly technical objection.

Lastly, it is insisted that the proof upon the trial in the circuit court of the court proceedings was incompetent, and the objection thereto by counsel for defendant should have been sustained. That proof was made by the county judge, himself, who testified from the record itself, and swore that he had made and entered the order as it therein appeared to be, and we think it was competent to prove the record in that manner. In 22 Corpus Juris 795, it is said: "It is usually held that an original judicial record properly verified will, if it can be produced, be admissible in any court, although a certified copy might also be admissible." And, while the ordinary mode of proof is to introduce a certified copy of the record made by its lawful custodian, yet the introduction of the original may be made, and it may be verified by both the clerk of the court, if it is one having a clerk, or by the judicial officer who made it.

To the extent indicated, the proceedings by the Fayette county judge in this case, sitting as a juvenile court, were, perhaps, somewhat informal and irregular, but we are unwilling to hold that such irregularities rendered the proceedings invalid.

The purpose and intent of the legislature in enacting our juvenile statute were substantially complied with; the investigation by the county judge as a juvenile court was made after acquiring jurisdiction in the manner pointed out by the statute, and his judgment was made a matter of record in his office and duly subscribed by him. That judgment was proven by his own oath at the trial, and we think that it would be trifling with justice to reject those proceedings as invalid because of the informalities and irregularities pointed out. We, therefore, hold that this second and last contention is without merit.

Because of the severity of the punishment, the age of defendant and the zeal of his counsel, we have tried to give this case a most thorough consideration. As stated, there can be no doubt of the defendant's guilt; but, because of his youth, coupled with the limited advantages under which he was reared, plus his somewhat subnormal intelligence, we might not have been willing

as jurors to inflict upon him the death penalty; but those facts are ones addressing themselves exclusively to the jury in the first place and to the executive department of the state after the jury has acted in a trial free from error, since in the absence of prejudicial error in the trial we cannot interfere. If the defendant's case should be presented to the executive department, we feel that it will be given due and thorough consideration, and that if he, under all the facts and circumstances, should be found to deserve a commutation of his sentence, it will be granted.

For the reasons stated, the judgment is affirmed.

The whole court sitting.