**Garrett Thomas DYE, Appellant**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2012–SC–000003–MR.

Supreme Court of Kentucky.

June 20, 2013.

Rehearing Denied Sept. 26, 2013.

---

Dennis M. Ritchie, for Appellant.

Jack Conway, Attorney General of Kentucky, Joyce Gail Guiling, Courtney J. Hightower, Assistant Attorney General, for Appellee.

Opinion of the Court by Justice SCOTT.

Appellant, Garrett Thomas Dye, pled guilty to Murder, Resisting Arrest, and Tampering with Physical Evidence. For these crimes, the Todd Circuit Court sentenced him to a total of fifty years' imprisonment. He now appeals as a matter of right, Ky. Const. § 110(2)(b), arguing that (1) his confession was coerced, (2) he did not knowingly and intelligently waive his *Miranda* rights, and (3) he unequivocally invoked his right to counsel. Additionally, he argues that all evidence seized pursuant to information obtained from his confession must be suppressed as "fruit of the poisonous tree." Because we conclude that Appellant's confession was involuntary, we now reverse and remand for further proceedings.

## I. BACKGROUND

On the evening of February 4, 2011, Appellant's nine-year-old sister went missing after spending that afternoon with Appellant shoveling gravel in their driveway. Appellant's parents notified the Todd County Sheriff's Department of her disappearance, and just after midnight on February 5, 2011, the girl's dead body was discovered in a thicket about 100 yards from Appellant's home.

Because there were signs of blunt force trauma to the girl's head and face, a search warrant was issued that morning at 5:28 a.m. for the recovery of items from the property and its buildings potentially related to her death, including potential weapons, clothes, and shoes. Pursuant to this search warrant, a number of items were recovered from Appellant's home and surrounding property, including two shovels, various clothes, tennis shoes, and a buccal swab DNA sample from Appellant.[1]

The same morning, Appellant and his parents were taken to the Trenton Police Station for questioning, but Appellant's father requested that Appellant, who was seventeen years old at the time, not be questioned until a lawyer could be retained on his behalf. Appellant was not questioned at that time.

The next day, law enforcement went to Appellant's home and arrested him for his sister's murder. Appellant was read his *Miranda* rights before being transported to the Logan County Courthouse where four officers (two at a time) took turns interrogating him for approximately two hours in the Court Designated Worker's (CDW) Office.[2] During the interrogation, Appellant confessed to murdering his sister. That evening, a second search warrant ("the February 6 search warrant") was issued based upon information contained in Appellant's confession, and additional incriminating items (similar to those seized pursuant to the first search warrant) were retrieved from his home.

At trial, Appellant moved to suppress his confession on the grounds that his *Miranda* waiver was involuntary, his right to counsel was invoked but denied, and his confession was coerced. The trial court denied the motion on all grounds. Thereafter, Appellant pled guilty to all counts but reserved his right to appeal. The trial court sentenced him to fifty years' imprisonment for murder, twelve months for resisting arrest, and three years for tampering, all to run concurrently for a total of fifty years.

## II. ANALYSIS

On appellate review of a trial court's denial of a motion to suppress, we generally apply the two-step process set

---

1. The evidence seized pursuant to this search warrant is not at issue in this appeal.

2. The CDW was not present during the interrogation.

out in *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), and adopted by Kentucky in *Adcock v. Commonwealth,* 967 S.W.2d 6 (Ky. 1998). Under this standard we review the trial court's findings of fact for substantial evidence, *id.* at 8, and then conduct a *de novo* review of the trial court's application of the law to the established facts to determine whether its ruling was correct as a matter of law, *Welch v. Commonwealth,* 149 S.W.3d 407, 409 (Ky.2004).

However, a simple application of this standard of review is insufficient in the case at bar because the trial court's findings of fact, although supported by substantial evidence in the record, are incomplete. For example, the trial court's order states that the officers told Appellant "how difficult things will be in the penitentiary." What the order omits, however, is the officers' actual message, i.e., that if Appellant did not confess he would be convicted, receive the death penalty, and be the subject of serious and repeated prison violence while awaiting execution. Thus, application of our normal standard of reviewing a ruling on a motion to suppress is inadequate here because it would require us to ignore facts relevant to the question of whether Appellant's substantial rights were violated.[3]

Moreover, as the U.S. Supreme Court noted in *Haynes v. Washington:*

It is well settled that the duty of constitutional adjudication resting upon this Court requires that the question whether the Due Process Clause of the Fourteenth Amendment has been violated by admission into evidence of a coerced confession be the subject of an independent determination here, *see, e.g., Ashcraft v. Tennessee,* 322 U.S. 143, 147–148, 64 S.Ct. 921, 923, 88 L.Ed. 1192 [(1944)]; 'we cannot escape the responsibility of making our own examination of the record,' *Spano v. New York,* 360 U.S. 315, 316, 79 S.Ct. 1202, 1203, 3 L.Ed.2d 1265 [(1959)]. While, for purposes of review in this Court, the determination of the trial judge or of the jury will ordinarily be taken to resolve evidentiary conflicts and may be entitled to some weight even with respect to the ultimate conclusion on the crucial issue of voluntariness, we cannot avoid our responsibilities by permitting ourselves to be 'completely bound by state court determination of any issue essential to decision of a claim of federal right, else federal law could be frustrated by distorted fact finding.' *Stein v. New York,* 346 U.S. 156, 181, 73 S.Ct. 1077, 1091, 97 L.Ed. 1522 [(1953)].

---

**3.** We by no means suggest that a reviewing court must *sua sponte* comb the record to determine whether the trial court's findings of fact on a motion to suppress are "complete." The *Ornelas–Adcock* standard of reviewing a trial court's findings of fact for substantial evidence is time-tested and will be sufficient in the great majority of cases. However, an appellate court reviewing for substantial evidence is not required to turn a blind eye to evidence in the record that is not fairly accounted for in the trial court's order when that evidence tends to show that a defendant's substantial rights have been violated. RCr 9.24 provides, in relevant part:

[N]o error or defect in any ruling or order, or in anything done or omitted by the court or by any of the parties, is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order unless it appears to the court that the denial of such relief would be inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties.

The negative inference of this rule is that a court need *not* disregard an error or defect that *does* affect the substantial rights of the parties or appears to be inconsistent with substantial justice.

373 U.S. 503, 515–16, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). Although the U.S. Supreme Court is the final arbiter of federal constitutional issues, we have previously recognized that "absent a substantial factual dispute in the evidence, voluntariness of a confession may be properly decided by a reviewing court." *Mills v. Commonwealth*, 996 S.W.2d 473, 481 (Ky. 1999) (*citing Jackson v. Denno*, 378 U.S. 368, 391–92, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964)), *overruled on other grounds by Padgett v. Commonwealth*, 312 S.W.3d 336 (Ky.2010). Most of Appellant's interrogation was audiotaped (although some parts are muffled or inaudible), and the material facts are not in dispute; we therefore invoke our authority to decide whether Appellant's confession was voluntary.

## A. Coerced Confessions

 In *Bailey v. Commonwealth*, we recited the relevant law concerning involuntary confessions:

> The Due Process Clause of the Fourteenth Amendment prohibits the admission of involuntary confessions: "[if the defendant's] will has been overborne and his capacity for self-determination critically impaired, the use of [the] confession offends due process." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). "The voluntariness of a confession is assessed based on the totality of the circumstances surrounding the making of the confession." *Mills v. Commonwealth*, 996 S.W.2d 473, 481 (Ky.1999). However, the threshold question to a voluntariness analysis is the presence or absence of coercive police activity: "coercive police activity is a necessary predicate to the finding that a confession is not Voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*,

479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473, 484 (1986).

194 S.W.3d 296, 300 (Ky.2006). Additionally,

> [t]he U.S. Supreme Court has described the "ultimate test" of the voluntariness of a confession as follows: "Is the confession the product of an essentially free and unconstrained choice by its maker?" *Schneckloth*, 412 U.S. at 225, 93 S.Ct. at 2047, 36 L.Ed.2d at 862 (internal citations omitted). Accordingly, in assessing voluntariness, "both the characteristics of the accused and the details of the interrogation are considered." *Schneckloth*, 412 U.S. at 226, 93 S.Ct. at 2047, 36 L.Ed.2d at 862. When examining the characteristics of the accused, reviewing courts consider such factors as age, education, intelligence, and linguistic ability. *Allee v. Commonwealth*, 454 S.W.2d 336, 341 (Ky.1970).

*Bailey*, 194 S.W.3d at 300. In *Henson v. Commonwealth*, we summarized the relevant inquiry as follows: "The three criteria used to assess voluntariness are 1) whether the police activity was 'objectively coercive;' 2) whether the coercion overbore the will of the defendant; and 3) whether the defendant showed that the coercive police activity was the 'crucial motivating factor' behind the defendant's confession." 20 S.W.3d 466, 469 (Ky.1999) (*citing Morgan v. Commonwealth*, 809 S.W.2d 704, 707 (Ky.1991)). We conclude that the interrogation techniques employed in this case satisfy these criteria.

### 1. Objectively Coercive Police Activity

First, the officers incorrectly and repeatedly informed Appellant that, if convicted, he could receive the death penalty (i.e., that he was "death eligible"). However, in *Roper v. Simmons*, the U.S. Supreme Court held that the Eighth and Fourteenth Amendments to the U.S. Con-

stitution impose a categorical bar to executing individuals who were under eighteen years old at the time of the crimes. 543 U.S. 551, 578, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). It is undisputed that all four interrogating officers knew Appellant was seventeen years old. At the suppression hearing, the officers admitted that they misinformed Appellant regarding his death-eligibility but maintained that, at the time, they believed he was death-eligible. The officers did not offer an explanation as to why they believed Appellant was death-eligible and we cannot begin to speculate— in addition to Appellant being ineligible due to his age, no aggravating circumstances were ever alleged to exist in this case. KRS 532.025(3) forbids the imposition of the death penalty unless a murder is accompanied by an aggravating circumstance. *See Young v. Commonwealth,* 50 S.W.3d 148, 162 (Ky.2001).

■ Each death penalty reference was immediately followed by an officer asserting that the only way for Appellant to avoid execution was to confess to the murder. Perhaps the most troubling exchange between Appellant and the officers regarding the death penalty occurred about an hour into the interrogation. To this point, Appellant had not made any incriminating statements and the officers had left the room to give Appellant a break. During the break Appellant began to cry. When the officers returned to the room, the following exchange occurred:

*Officer:* Are you sure you don't want anything? Use the bathroom or anything? You hungry or anything?

*Appellant:* I don't know what I am. I'm just scared.

*Officer:* I know you're scared, man. I know you are.

*Appellant:* Is it the death penalty?

*Officer:* I'm sorry?

*Appellant:* Are they gonna give me the death penalty?

*Officer:* Oh yeah.

*Appellant:* [inaudible]

*Officer:* Now, you'll probably spend twenty or thirty years on death row in a room all by yourself.... That's why I was trying to tell you man, this is the only chance you got to avoid all that right now. Tonight, tonight will be your only chance.

Not only did the officer erroneously convey that Appellant was death-eligible, but also that he was *certain* to receive a death sentence *unless* he confessed to his sister's murder.

After a similar exchange, an officer told Appellant: "I hate to see you at seventeen years old go to the pen[etentiary] for the rest of your life or spend the next fifteen or twenty years of your life on death row. This is the only way you're going to avoid that." A few minutes later, an officer told Appellant: "We've put people on death row and electrocuted them with a whole lot less evidence than we got on you. I mean a *whole* lot less."

■ We hold that repeatedly threatening a seventeen-year-old with the death penalty is "objectively coercive." *Henson,* 20 S.W.3d at 469. The interrogating officers knew, or should have known, that Appellant was not death-eligible (1) due to his status as a juvenile, *see Roper,* 543 U.S. at 578, 125 S.Ct. 1183, and (2) because there was no evidence or allegation of aggravating circumstances that would have otherwise made this case death-eligible. *See* KRS 532.025(2). We therefore conclude that the interrogating officers' untruthful threats were improperly employed to overbear Appellant's will and critically impair his capacity for self-determination. *Schneckloth,* 412 U.S. at 225–26, 93 S.Ct. 2041. Thus, it is "objectively coercive." *Henson,* 20 S.W.3d at 469.

Likewise, the officers made several inappropriate allusions to prison violence or rape throughout the interrogation. For example, about an hour into the interrogation one of the officers warned Appellant: "I can tell you right now, a seventeen-year-old or eighteen-year-old young buck straight into [the Kentucky State Prison (KSP) at] Eddyville, killing a nine-year-old—you can imagine what they're going to do to you on a daily basis." A second officer told Appellant that he "wouldn't want nobody to have to do that to my own son, but that's exactly what they're going to do to you."

Later in the interview, the officers again told Appellant that unless he confessed he would be tried as an adult and incarcerated at KSP where, according to the officers, the inmates treat child murderers the same way they treat individuals convicted of a sexual crime against a child:

*Officer 1:* Your status—with killing a nine-year-old—you're gonna be down there with the scum of the earth.

*Officer 2:* And they won't spare no mercy on your ass. Even the guards, they gonna be like, "You piece of shit." . . . [Murder] and sexual assault . . .

*Appellant:* Sexual assault?

*Officer 1:* Any violent crime against a small child. . . . Everybody's gonna forget about you until you get to Eddyville then they'll remind you what happened. *Every day* they'll remind you.

We will not feign ignorance to the fact that the officers were alluding to prison violence and/or rape and that is precisely how Appellant understood these comments. We hold that attempting to persuade a seventeen-year-old that a confession is the only way he will avoid daily prison assault—sexual or otherwise—is "objectively coercive." *Henson*, 20 S.W.3d at 469.

Finally, we find it troublesome that the officers continually dissuaded Appellant from invoking his right to counsel. Although we need not determine whether Appellant unequivocally and unambiguously invoked his right to counsel, or whether the alleged waiver of his *Miranda* rights was coerced, this conduct is nonetheless relevant to our "totality of the circumstances" review. *See Mills*, 996 S.W.2d at 481. One exchange—about eighty minutes into the interrogation, and just moments before Appellant began confessing—is particularly bothersome:

*Officer 1:* You know what your options are now.

*Appellant:* I just don't want to say anything until my lawyers get here, and they can't get here until Monday.

*Officer 1:* Well like I said, man, nobody's gonna tell you you can't have a lawyer, the thing is you don't have to have a lawyer to tell the truth. Like I told you, *every* person in the penitentiary had a lawyer. You know what I mean? Lawyers don't make you tell the truth.

*Officer 2:* The only thing that can make you tell the truth is because that's what you want to do and because that's what's in your heart.

. . . .

Let me bottom line it for you: I'm the case officer. And I will talk to you until the moon turns blue. But people that I don't like talking to is, guess what? Attorneys. Okay? So I'm not saying you have to sit here and talk to me, but if you want to and if there's something you want to say I wish to God you'd say it now before this officer gets here to transport you.

. . .

If you want to maintain being a hard-ass and not wanting to talk and blah-blah this and blah-blah that, then when you're ready to talk—when your attor-

ney says, "Hey, we need to sit down and talk to the police"—uh uh. No. Because you had your chance right now.

When considered in context of the entire conversation, we believe that the intended effect of this exchange (and similar exchanges) was to alert Appellant, a seventeen-year-old, that if he *did* invoke his right to an attorney his opportunity to confess—and thereby avoid the death penalty and prison violence—would be lost. We hold that this is "objectively coercive." *Henson*, 20 S.W.3d at 469.

### 2. Overborne Will

Upon thorough review of the interrogation, we conclude that inducing Appellant to forfeit his right to counsel and provide an immediate confession by playing to his fears of death and assault overbore his will. This is most clear in the two exchanges recounted above. First, after an hour of interrogation involving substantial discussion of the death penalty and references to inter-inmate violence, the officers left the room to give Appellant a break. Predictably, he began crying and when the officers returned he immediately told them that he was scared and asked them if he was really going to receive the death penalty. About twenty minutes later, the interrogators gave Appellant an ultimatum: confess and avoid the death penalty and life on death row, or invoke his right to counsel and lose his opportunity to confess. Unsurprisingly, Appellant began confessing moments later. This is sufficient for us to conclude that the second *Henson* prong is satisfied.

### 3. Crucial Motivating Factor

For the same reasons as the second, the third *Henson* prong is satisfied: "the coercive police activity was the 'crucial motivating factor' behind the defendant's confession." 20 S.W.3d at 469. While Appellant spent the hour before the break denying any involvement in his sister's murder,

Appellant's attitude completely changed after the reality set in that he either confess or face death. When the officers returned to the interrogation room from the break, the first things Appellant said were "I'm scared" and "Are they going to give me the death penalty?" He was told repeatedly that (1) this was his last and only chance to confess, (2) if he *did* confess he could avoid the death penalty, (3) but if he did *not* confess he was going to be executed, and (4) he would be subject to assault while on death row. Additionally, he was told that if he invoked his right to counsel he would lose his opportunity to confess. This coercive police activity was not ancillary to the confession; it was the "crucial motivating factor." *Id.*

 We hold that under the totality of the circumstances, Appellant's confession was not "the product of an essentially free and unconstrained choice by its maker," *Schneckloth*, 412 U.S. at 225, 93 S.Ct. 2041, but rather the product of "coercive police activity," *Connelly*, 479 U.S. at 167, 107 S.Ct. 515. Accordingly, it must be suppressed. *See, e.g., Johnson v. New Jersey*, 384 U.S. 719, 729 n. 9, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966) ("Coerced confessions are, of course, inadmissible regardless of their alleged truth or falsity.") (*citing Rogers v. Richmond*, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961)). "[C]ertain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller v. Fenton*, 474 U.S. 104, 109, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) (*citing Brown v. Mississippi*, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936)). As the U.S. Supreme Court explained in *Schneckloth*:

'[V]oluntariness' has reflected an accommodation of the complex of values implicated in police questioning of a suspect. At one end of the spectrum is the acknowledged need for police questioning as a tool for the effective enforcement of criminal laws. *See Culombe v. Connecticut*, supra, [367 U.S. 568] at 578–580, 81 S.Ct. [1860], at 1865–1866 [6 L.Ed.2d 1037 (1961)]. Without such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished. *Haynes v. Washington*, 373 U.S. 503, 515, 83 S.Ct. 1336, 1344, 10 L.Ed.2d 513. At the other end of the spectrum is the set of values reflecting society's deeply felt belief that the criminal law cannot be used as an instrument of unfairness, and that the possibility of unfair and even brutal police tactics poses a real and serious threat to civilized notions of justice. '(I)n cases involving involuntary confessions, this Court en-

forces the strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will.' *Blackburn v. Alabama*, 361 U.S. 199, 206–207, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 [(1960)]. 412 U.S. at 224–25, 93 S.Ct. 2041. Due process demands suppression.

## B. Exclusion of Evidence

■ Because we are remanding to the trial court for further proceedings, we must address Appellant's related claim: whether the evidence seized pursuant to the February 6 search warrant—which was issued upon information contained in his involuntary confession—must also be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). This is a question the U.S. Supreme Court has not yet answered and one that this Court has not directly addressed.[4] *See generally 1 McCormick on Evidence § 159*

---

4. We acknowledge that our predecessor court has addressed similar issues. See *Baughman v. Commonwealth*, 206 Ky. 441, 267 S.W. 231 (1924); *McQueen v. Commonwealth*, 196 Ky. 227, 244 S.W. 681 (1922). However, neither *Baughman nor McQueen* involved federal constitutional claims. Rather, the confessions were analyzed under the so-called "Anti–Sweating Act," *see* KRS 422.110; *Baughman* also involved an alleged violation of Section 11 of the Kentucky Constitution. Both cases involved involuntary confessions in which the defendant identified "extraneous facts" leading to the discovery of reliable evidence. And, in both cases, the old Court of Appeals held that although the confessions were inadmissible, the evidence obtained pursuant to the "extraneous facts" was admissible. *Baughman*, 267 S.W. at 234–35; *McQueen*, 244 S.W. at 685. *Baughman* and *McQueen* were decided at a time when the prevailing theory on the admissibility of evidence obtained under these circumstances turned on *reliability*. See Yale Kamisar, *On the "Fruits" of Miranda Violations, Coerced*

*Confessions, and Compelled Testimony*, 93 Mich. L.Rev. 929, 937–39 (1995). "During the period roughly extending to the 1950s, physical evidence uncovered as a result of an involuntary confession was, unsurprisingly, admissible—because the derivative evidence, unlike the confession, was reliable. Indeed, it was generally held that if the extrinsic evidence corroborated the confession ... even the confession could be admitted." *Id.* at 937–38 (footnotes, citations, and internal quotation marks omitted).

In contrast, the modern view is "that the due process exclusionary rule for confessions (in much the same way as the Fourth Amendment exclusionary rule for physical evidence) is also intended to deter improper police conduct." *Id.* at 938–43 (*quoting* 1 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 6.2, at 443 (1984)). Accordingly, it is unlikely that *McQueen* and *Baughman* would pass muster under the modern federal constitutional analysis applicable to coerced confessions.

(7th Ed.2013); *see also* Yale Kamisar, *On the "Fruits" of Miranda Violations, Coerced Confessions, and Compelled Testimony,* 93 Mich. L.Rev. 929 (1995). However, there is substantial support for a Fifth Amendment exclusionary rule similar (or identical) to the "fruits" doctrine. *See generally* 1 *McCormick on Evidence* at § 159; Kamisar, *supra,* at 940–954. As one leading academic treatise explains:

> [T]he [United States] Supreme Court has not had direct occasion to decide whether, *in the police interrogation context,* the exclusionary rule requires suppression of reliable fruits of a statement obtained in violation of the Fifth Amendment. There is little doubt that this is the rule, however. First, the Court held in *Counselman v. Hitchcock* that the Fifth Amendment privilege prevents the government from using compelled grand jury testimony to obtain knowledge of ... sources of information which may supply other means of convicting a defendant.[5] As Professor Yale Kamisar has observed, "ever since the 110–year–old case of *Counselman* ... was decided, it has been plain that the privilege prohibits the derivative use, as well as the direct use, of compelled utterances."[6] There is no reason to believe that a different rule applies to statements compelled by the police, rather than the grand jury.

And, the Court *has* applied the poisonous-tree principle in a police interrogation context, albeit outside the Fifth Amendment [in *Harrison v. United States,* 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968) ].... Since the "poisonous tree" in *Harrison* was a nonconstitutional supervisory-authority rule, it follows that a violation of the Constitution itself (the Fifth Amendment privilege) requires implementation of the poisonous-tree doctrine.

Finally, it is worth observing that a plurality of the Court—including its most conservative members—recently recognized a Fifth Amendment fruit-of-the-poisonous-tree doctrine in dictum. In *Chavez v. Martinez,*[7] Justice Thomas, writing for the Chief Justice and Justices O'Connor and Scalia, observed that "our cases provide that those subjected to coercive police interrogations have an *automatic* protection from the use of their involuntary statements (*or evidence derived from their statements* ) in any subsequent criminal trial."[8] Of course, the Fifth Amendment version of the fruit-of-the-poisonous-tree doctrine is subject to the same limiting principles as its counterparts in the Fourth and Sixth Amendments—the independent-source, inevitable discovery, and dissipation-of-taint-doctrines.

Joshua Dressier & Alan C. Michaels, *Understanding Criminal Procedure: Volume*

---

5. 142 U.S. 547, 586, 12 S.Ct. 195, 35 L.Ed. 1110 (1892).

6. Yale Kamisar, *A Look Back on a Half–Century of Teaching, Writing and Speaking About Criminal Law and Criminal Procedure,* 2 Ohio St. J.Crim. L. 69, 83 (2004).

7. 538 U.S. 760, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003).

8. *Id.* at 769, 123 S.Ct. 1994 (latter emphasis added). Not all commentators agree that the fruit-of-the-poisonous-tree doctrine *should* apply to tangible evidence. Amar and Lettow, for example, make the following textual argument: the Fifth Amendment prohibits a defendant from being a "witness" against herself; tangible evidence is not a "witness" (as it does not testify); therefore, "[p]hysical evidence ... can be introduced at trial whatever its source—even if that source is a compelled pre-trial utterance." [Akhil Reed Amar & Renee B. Lettow, *Fifth Amendment First Principles: The Self-incrimination Clause,* 93 Mich. L.Rev. 857, 900 (1995) ].

*1: Investigation* § 23.05[B][3][b][ii], at 464–65 (4th Ed.2006). Thus, it is generally recognized that the "fruits" doctrine applies, on principles of due process and deterrence, to Appellant's situation. *See* Kamisar, *supra,* at 937–43.[9]

However, the Fourteenth Amendment's Due Process clause *is* violated by coercive police activity resulting in a confession. *Miller v. Fenton,* 474 U.S. at 108, 106 S.Ct. 445

■ For example, in *California v. Ditson,* the Supreme Court of California opined:

It appears to us to follow that if it offends "the community's sense of fair play and decency" to convict a defendant by evidence extorted from him in the form of an involuntary confession, that sense of fair play and decency is no less offended when a defendant is convicted by real evidence which the police have discovered essentially by virtue of having extorted such a confession. If the one amounts to a denial of a fair trial and due process of law, so must the other. If the one is the inadmissible product of 'police procedure which violates the basic notions of our accusatorial mode of prosecuting crime' (*Watts v. Indiana* (1949), *supra,* 338 U.S. 49, 55 [69 S.Ct. 1347, 93 L.Ed. 1801] ), so must the other be. It does not appear that we can draw a constitutionally valid distinction between the two.

57 Cal.2d 415, 439, 20 Cal.Rptr. 165, 369 P.2d 714 (1962). We are persuaded by this analysis and now adopt it as law in Kentucky.

■ Apparently conceding that evidence seized under these circumstances must otherwise be suppressed, the Commonwealth argues that the evidence recovered pursuant to the February 6 search warrant is admissible under the "inevitable discovery" doctrine. *See Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1991). In *Nix,* the U.S. Supreme Court held that evidence unlawfully obtained by police is nevertheless admissible "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means...." *Id.* at 444, 104 S.Ct. 2501. This "doctrine has been applied to the

---

9. We acknowledge the U.S. Supreme Court's fractured decision in *United States v. Patane,* 542 U.S. 630, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004), lends additional, but limited, guidance. In *Patane,* Justice Thomas's plurality opinion held that the failure to give a suspect *Miranda* warnings does not require suppression of physical fruits of the suspect's unwarned but *voluntary* statements. *Id.* at 634, 124 S.Ct. 2620. *Patane* is distinguishable from the present case in that Appellant *was* read his *Miranda* rights but his confession was coerced, i.e., *involuntary.* This is significant insofar as Justice Thomas's opinion relied, in part, on the fact police do not violate the Constitution by merely failing to provide *Miranda* warnings, *id.* at 637, 124 S.Ct. 2620, and the "fruits" doctrine is a *constitutional* exclusionary requirement. *See Oregon v. Elstad,* 470 U.S. 298, 305, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

However, the Fourteenth Amendment's Due Process clause is violated by coercive police activity resulting in a confession. Miller v. Fenton, 474 U.S. at 108 ("This Court has long held that certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment.") (*citing Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936)). Accordingly, extending the "fruits" doctrine to the factual scenario presented by this case is not inconsistent with the plurality opinion in *Patane.* We also note Justice Thomas authored the previously discussed plurality opinion in *Chavez,* which appears to approve of applying the "fruits" doctrine to cases like the one at bar. *See* footnotes 7 & 8, *supra,* and accompanying text.

fruits of illegal searches as well as to the fruits of illegally obtained confessions." *Hughes v. Commonwealth,* 87 S.W.3d 850, 853 (Ky.2002) (*citing United States v. Scott,* 270 F.3d 30, 42 (1st Cir.2001); *United States v. Kimes,* 246 F.3d 800, 803–04 (6th Cir.2001); *United States v. Ford,* 184 F.3d 566, 577 (6th Cir.1999)).

We believe that whether the evidence seized pursuant to the February 6 search warrant would inevitably have been discovered is a question that should initially be addressed by the trial court after an appropriate hearing on the matter.

### III. CONCLUSION

We conclude that Appellant's confession was involuntary under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. We therefore reverse the judgment and sentence of the Todd Circuit Court and remand to that court for further proceedings consistent with this opinion.

All sitting. All concur.