# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### May 20, 2015 Session

## STATE OF TENNESSEE v. CARLOS CAMPBELL

**Appeal from the Criminal Court for Knox County**
**No. 100509     Steven W. Sword, Judge**

---

### No. E2014-00697-CCA-R3-CD – Filed October 20, 2015

---

The Defendant, Carlos Campbell, was indicted for seven counts of attempted first degree murder, a Class A felony; two counts of employing a firearm during the commission of a dangerous felony, a Class C felony; and two counts of felony reckless endangerment by discharging a firearm into a habitation, a Class C felony. See Tenn. Code Ann. §§ 39-12-101, -13-103, -13-302, -17-1324(b)(1). Prior to trial, the State dismissed the reckless endangerment charges. Following a jury trial, the Defendant was convicted of two counts of attempted first degree murder, one count of employing a firearm during the commission of a dangerous felony, and five counts of misdemeanor reckless endangerment. See Tenn. Code Ann. § 39-13-103(b)(1). The jury acquitted the Defendant of the other charge of employing a firearm during the commission of a dangerous felony. The trial court sentenced the Defendant to a total effective sentence of forty-six years. On appeal, the Defendant contends (1) that the trial court erred in denying his motion to suppress one of his confessions to the police; (2) that the portion of his confession played at trial contained impermissible evidence of other prior bad acts; (3) that there was no evidence corroborating his confessions; (4) that the evidence was insufficient to sustain his convictions; (5) that the trial court erred in setting the length of his sentences for attempted first degree murder; and (6) that the trial court erred in imposing partial consecutive sentences.[1] At oral arguments, we instructed the parties to submit supplemental briefs on the issue of whether misdemeanor reckless endangerment is a lesser-included offense of attempted first degree murder. Following our review, we affirm the Defendant's convictions and sentences for attempted first degree murder and employing a firearm during the commission of a dangerous felony. However, we conclude that misdemeanor reckless endangerment is not a lesser-included offense of attempted first degree murder; therefore, the Defendant's convictions for misdemeanor reckless endangerment are reversed and dismissed.

---

[1] For the purpose of clarity, we have renumbered and reordered the issues as stated by the Defendant in his appellate brief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Reversed in Part; and Dismissed in Part**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and CAMILLE R. MCMULLEN, J., joined.

Bruce E. Poston, Knoxville, Tennessee (at trial); and Loretta G. Cravens, Knoxville, Tennessee (on appeal), for the appellant, Carlos Campbell.[2]

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Randall Eugene Nichols, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

Terry A. Maroney, Nashville, Tennessee; and Joshua A. Tepfer and Steven A. Drizin, Chicago Illinois, for amicus curiae, Center on Wrongful Convictions of Youth, Bluhm Legal Clinic, Northwestern University School of Law.

## OPINION

## FACTUAL BACKGROUND[3]

At 3:15 a.m. on August 13, 2012, the Knox County Emergency Communications District began to receive 911 calls about a shooting at a residence on Wilder Place in Knoxville. Officers C. Cadet Hutton and Jeff Hopkins of the Knoxville Police Department (KPD) responded to the home. The officers found parked "on the north side" of the house a black Nissan Maxima with "a bullet hole near the gas tank . . . on the driver's side." They also found a silver Lincoln that belonged to Devante Nail "parked on the east side of the house" that "had been struck approximately six times down the driver's side quarter panels from the front to the rear." Officer Hutton testified that it appeared that no one was in the cars when they were shot.

The officers found ten Smith and Wesson .40 caliber shell casings "spread out" at a nearby intersection. They also found "two large chunks of grass that were torn up" in the yard next to the silver Lincoln. Officer Hutton opined that the chunks of grass could have "possibly [been from] shotgun blasts." Officer Hutton testified that the house had been struck by two bullets, once on "the corner of the house" and once on "the east side

---

[2] Prior to the Defendant's appellate brief being filed, Mr. Poston was killed in a single vehicle accident. Thereafter, Ms. Cravens was appointed as counsel of record for the Defendant.

[3] This section will discuss only the factual background regarding the Defendant's convictions. The factual background of the Defendant's procedural issues will be discussed in other portions of this opinion.

of the house facing Wilder Place." However, Officer Hutton testified that the bullets "actually entered the wall but did not make it all the way through [to the inside of] the residence."

Officer Hopkins testified that when they arrived at the house, Mr. Nail was the only person standing outside. Officer Hopkins recalled that there were three other people in the house that morning and that they told him that they "[h]ad heard nothing." Officer Hutton testified that "[e]verybody inside was okay, nobody had been struck by gunfire." Officer Hutton did not see any bullet holes inside the house, but Officer Hutton did recall seeing a box of twelve gauge shotgun shells on the living room table.

Brittaney Nail was the only victim to testify at trial. Ms. Nail testified that on August 13, 2012, she was living with her sister, Lakeshia Reynolds, at the house on Wilder Place. Ms. Nail also testified that Mr. Nail was her brother. According to Ms. Nail, she was at the house that morning with Ms. Reynolds; Ms. Reynolds's friend, Tamichael Bennett; Mr. Nail; and Mr. Nail's girlfriend, Darlessa Clemons. Ms. Nail testified that she had slept on the couch while Mr. Nail and Ms. Clemons were in Mr. Nail's bedroom, and Ms. Reynolds and Mr. Bennett were in Ms. Reynolds's bedroom.

Ms. Nail recalled that she woke up to Ms. Reynolds asking if she had heard a noise. Ms. Nail testified that the next thing she remembered was the police knocking on the door because "the neighbor had called the police [and] said they heard shooting." Ms. Nail admitted that she did not hear "any shooting" that morning. Ms. Nail testified that the next morning she saw the damage to the two cars and "a couple of holes" on the side of the house.

At 2:29 a.m. on August 15, 2012, the Knox County Emergency Communications District began receiving 911 calls about another shooting at the Wilder Place residence. Ms. Nail testified that on the morning of August 15, 2012, she and Ms. Clemons were the only people in the house. Ms. Nail recalled that they were awake, with several lights on in the house, and watching movies in the living room that morning. Ms. Nail admitted that there were no cars parked in front of the house and that the windows had dark curtains. According to Ms. Nail, she was sitting on a couch pushed up against a window with her "front towards the window," and Ms. Clemons was next to her "with her back towards the window," when "all of a sudden, [they] just heard gunshots and [saw] the plaster from the walls going everywhere."

Ms. Nail testified that she and Ms. Clemons got on the ground and waited for the shooting to end. Ms. Nail stated that she was "really just scared" and shocked during the shooting. Once the shooting ended, Ms. Clemons called Mr. Nail and told them to call the police. Ms. Nail then called 911, and during the call, she told the 911 operator that she saw who had shot at the house and recognized his face. Ms. Nail then said that the

Defendant was the shooter. Ms. Nail admitted at trial that she had not actually seen the shooter that night. Ms. Nail explained that she told the 911 operator that the Defendant had shot at the house because Ms. Clemons told her that she had heard the Defendant's name "a lot in conversation."

Officer Hopkins testified that he responded to the shooting on August 15, 2012. Officer Hopkins testified that the house "was riddled with gunshots" with "pieces of drywall just scattered all over the place indicating that it had been struck multiple times." Officer Hopkins also testified that Ms. Clemons had "a through and through hole in her shirt" and a "scratch mark" on her back where, Officer Hopkins opined, a bullet had almost struck her. Ms. Nail testified that the next day, she found bullet holes in the bathroom in addition to the ones in the living room that the police had photographed.

KPD Investigator Chas Terry testified that he investigated the shootings at the Wilder Place house. Inv. Terry testified that when he went to the house after the August 15, 2012 shooting, he "saw numerous bullet holes throughout the entire house," including "the bedroom, kitchen, [and] living room." Inv. Terry also found a bullet "that had gone through the length of the house, gone out of the back door, [and] landed in a trash can." An "additional fragmented round" was also found inside the house.

Inv. Terry testified that he questioned the Defendant about the shootings on August 26, 2012. Inv. Terry testified that he advised the Defendant of his constitutional rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), and that the Defendant signed a "rights waiver" form. Inv. Terry recalled that the Defendant initially denied any involvement in the shootings, but by the end of the questioning, he told Inv. Terry that Cuben Lagrone was the shooter and that "he simply drove."

Inv. Terry testified that he interrogated the Defendant again in October 2012 after the Defendant signed a second "rights waiver" form. Inv. Terry stated that he was assisted by KPD Investigator Brandon Wardlaw during portions of that interrogation. Inv. Terry testified that during the October 2012 interrogation, the Defendant stated "once again, [that] he was driving" during the shootings and that Cuben was the shooter. Inv. Terry further testified that the Defendant never admitted to him that he shot at the house during either of the interrogations. Inv. Terry also explained that it took around fifteen minutes to get from the Defendant's neighborhood to Wilder Place. An approximately fifty-minute excerpt of the October 2012 interrogation was played for the jury.

During the excerpt played for the jury, the Defendant stated that from what he knew, the conflict between Cuben Lagrone and Mr. Nail started when Mr. Nail's little brother "got jacked." The Defendant explained that Mr. Nail's brother "got robbed" but that his friends lied about making Mr. Nail's brother "get naked." The Defendant further

explained that Mr. Nail's brother had "walked up on the car" and "was mugging and stuff." The Defendant claimed that he never left the car but that one of his friends told Mr. Nail's brother to empty his pockets, and Mr. Nail's brother emptied his pockets and they "took his cell phone."

The Defendant then stated that Mr. Nail came to the Mechanicsville neighborhood of Knoxville "three or four times" and shot at a house "twice." The Defendant claimed he was not in Mechanicsville for any of the occasions when Mr. Nail and his friends were there. The Defendant further claimed that "some people would call" him bragging about the shootings and threatening him. The Defendant told the investigators that Mr. Nail repeatedly said that "he was gonna shoot" him.

The Defendant also stated that Mr. Nail's little brother "was talking s--t on Twitter" about how "[t]hey was . . . gonna kill" a "little dude" that lived in Mechanicsville. The Defendant then detailed an ongoing Twitter exchange with people from the "east side" and stated that he told Mr. Nail that he "didn't want no problems with him."

The Defendant admitted to driving the car during the shootings at the Wilder Place house. The Defendant stated that Cuben told him how to get to the house and admitted that a third man, Quinton, was in the car with them. The Defendant also stated that he was driving a white car. The Defendant said that he did not know how Cuben and Quinton knew that Mr. Nail would be at the Wilder Place house and that they had "s--t that they [did not] tell [him] all the time." The Defendant said he "guess[ed]" that Cuben and Quinton wanted to shoot at the house because Mr. Nail put their "name[s] in [a] Tweet" that said "F--k the Ville."

The Defendant told the investigators that as they drove past the house on Wilder Place, Cuben and Quinton "start[ed] shooting" and shot "a whole clip." The Defendant said that he could not remember where they went after the shooting. The Defendant denied calling anyone to say "we done bust 'em back." Inv. Terry stated that an hour after the first shooting his "phone was blowing up" with messages that the Defendant, Cuben, and Quinton "shot up that house." Inv. Terry then asked what Mr. Nail did after the first shooting "to get back at y'all" to make them go over there a "second time."

The Defendant said that Mr. Nail came to Mechanicsville "two cars deep." The Defendant claimed that he was not there at the time, but he was told that Mr. Nail came "strapped up" and "looking for" him, Cuben, and Quinton. The Defendant also claimed that "they shot . . . at [him] on the east side." However, the Defendant then claimed that he did not know that the house "got shot up twice" or the reason for the second shooting. Inv. Wardlaw said that there were actually three shootings at the house, but only two

were reported. Inv. Terry then told the Defendant that he had "just told" them that he "drove both times."

After that, the Defendant admitted that he was in the white car again for the second shooting and that Cuben and Quinton were both with him. The Defendant also admitted that a juvenile was with them that night. The Defendant then said that they went to the house on Wilder Place because Quinton said Mr. Nail was at the house and that "they started shooting." The Defendant "guess[ed]" that they shot "the clip" again. The Defendant stated that they "went to the crib probably" after the shooting. The Defendant reiterated that both times he was "just driving" and that he did not "shoot up cribs."

Inv. Wardlaw testified he was present for portions of the Defendant's October 2012 interrogation and that the Defendant "said that he only was the driver and he never shot at anyone." Inv. Wardlaw testified that he was present at a May 2013 suppression hearing in this case and that at the suppression hearing, the Defendant testified that "he actually was one of the shooters." Trial counsel did not object to this testimony.

Patricia M. Resig, a firearms examiner for the KPD, testified as an expert witness in firearms identification. Ms. Resig testified that she examined the ten Smith and Wesson .40 caliber casings recovered after the August 13, 2012 shooting and that all ten casings had been fired from "the same unknown gun." With respect to the August 15, 2012 shooting, Ms. Resig testified that she examined two .40 caliber bullets that she opined had been fired from a Glock handgun, a .380 caliber casing that she found "no matches" for, and a 9 mm casing and bullet.

Ms. Resig testified that she was able to match the 9 mm casing to a Ruger pistol seized from Cuben Lagrone and that the bullet "could have been fired" from the Ruger pistol, but "there was a lack of sufficient matching individual characteristics" for her to "say it was indeed fired through that" gun. Ms. Resig opined that, in all, three guns had been used during the August 15, 2012 shooting.

Based upon the foregoing evidence, the jury convicted the Defendant of five counts of misdemeanor reckless endangerment and acquitted him of the charge of employing a firearm during the commission of a dangerous felony for the August 13, 2012 shooting. For the August 15, 2012 shooting, the jury convicted the Defendant of two counts of attempted first degree murder and one count of employing a firearm during the commission of a dangerous felony.

At the sentencing hearing it was established that the Defendant had two convictions for simple possession of marijuana as an adult. The Defendant's juvenile record was much more extensive. In 2007, the Defendant was adjudicated delinquent for

committing aggravated robbery and vandalism of $500 or less.  In 2008, he was adjudicated delinquent for conspiracy to commit aggravated robbery and also had his probationary sentence revoked.  In 2009, the Defendant was adjudicated delinquent for committing aggravated assault and unlawful possession of a weapon.  In 2010, he was adjudicated delinquent for committing reckless endangerment with a deadly weapon and vandalism valued at more than $500 but less than $1,000.  Also at the sentencing hearing, the Defendant admitted to being present at both shootings and shooting at the house on August 13, 2012, but denied doing so on August 15, 2012.

In sentencing the Defendant, the trial court applied the following enhancement factors to all of the Defendant's convictions:  (1) the Defendant had a previous history of criminal convictions or behavior in addition to those necessary to establish the appropriate range; (3) the offenses involved more than one victim; (8) the Defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community; (13) the Defendant was released on bail at the time the felony offenses were committed; and (16) the Defendant had been adjudicated to have committed delinquent acts as a juvenile that would constitute felonies if committed by an adult.  See Tenn. Code Ann. § 40-35-114.  The trial court also found that the Defendant had no hesitation about committing a crime when the risk to human life was high with respect to the misdemeanor reckless endangerment convictions.  See Tenn. Code Ann. § 40-35-114(10).

The trial court sentenced the Defendant to eleven months and twenty-nine days for each of the misdemeanor reckless endangerment convictions, twenty years for each of the attempted first degree murder convictions, and the mandatory minimum six years for the employing a firearm during the commission of a dangerous felony conviction.  The trial court also found that consecutive sentences were warranted because the Defendant was a dangerous offender and had an extensive history of criminal activity.  See Tenn. Code Ann. § 40-35-115(b)(2), (4).  The trial court ordered the Defendant's sentences for his attempted first degree murder convictions and employing a firearm during the commission of a dangerous felony conviction to run consecutively.  The trial court further ordered that the Defendant's sentences for his misdemeanor reckless endangerment convictions run concurrently to his felony convictions, for a total effective sentence of forty-six years.

## ANALYSIS

### I. Suppression Motion

The Defendant contends that the trial court erred in denying his motion to suppress his October 2012 confession to KPD Investigators Terry and Wardlaw.  The Defendant argues that his confession "was involuntary and the product of police coercion."

Specifically, the Defendant argues that Investigators Terry and Wardlaw coerced him into confessing to his role in the shootings by telling him "he would be subjected to daily prison rapes" and violence; by threatening "to tell the prosecutor that he was uncooperative" and also "indicating he would receive a reduced sentence . . . if he confessed"; and "with promises of food." Amicus curiae agree with the Defendant that Investigators Terry and Wardlaw's techniques "were objectively coercive" and argue that the Defendant was "more-than-usually vulnerable to [these] coercive interrogation tactics" given his age.

The State responds by taking issue with the Defendant's characterization of Investigators Terry and Wardlaw's techniques as being objectively coercive and argues that "the investigators' collective conduct did not overbear the [D]efendant's will or cause his confession." The State further argues that any error in the admission of the October 2012 confession was ultimately harmless as two other confessions made by the Defendant were entered into evidence without objection.

*A. Factual Background Regarding the Defendant's Confessions*

We have reviewed the video recordings of both the August and October 2012 interrogations of the Defendant. In the August 2012 interrogation, Inv. Terry spoke with the Defendant alone for approximately an hour and a half. After advising the Defendant of his <u>Miranda</u> rights, the Defendant verbally waived his rights only after Inv. Terry told the Defendant that he could talk to him or "they [could] just take" him to jail. Initially, the Defendant denied any knowledge of the shootings or even knowing Mr. Nail.

Eventually, Inv. Terry told the Defendant that it was "inevitable" that the Defendant would be "charged" but that he was not going to "charge" the Defendant at that time because the Defendant was not whom he wanted. The Defendant then said that Mr. Nail "and them" had started things by coming to the Mechanicsville neighborhood "strapped up" and "hopped out on some people." The Defendant also said that he was told "it got started" with "a b---h" going back and forth between Cuben Lagrone and Mr. Nail.

Inv. Terry then started telling the Defendant, repeatedly, that it was "hard to drive and shoot . . . at the same time." The Defendant continued to deny any involvement in the shootings, and Inv. Terry asked the Defendant if he knew "the difference between driving a car" and "just passengers in the car start shooting." Inv. Terry also told the Defendant that either the Defendant or Cuben was driving the car. The Defendant denied shooting and asked, "You want me to say that I drove?" Inv. Terry continued to repeatedly state "if you driving, you ain't shooting."

Inv. Terry "turned off" his audio recorder to have "a bulls--t free conversation" while a camera in the corner of the room continued to record the Defendant. When the Defendant again denied being present for the shooting, Inv. Terry got up to leave the room and told the Defendant that, when he left the room, he would be "done with it" and be "back in f--king attack mode." The Defendant asked Inv. Terry how talking to him would "help." Inv. Terry answered "because if you driving a car you can't be shooting and driving a car at the same time."

The Defendant said that he did not "like to shoot up cribs" because that was not "his style." Inv. Terry asked the Defendant again if he was at the shootings and told him that his "honesty" would help him. The Defendant asked if he could go home that day, and Inv. Terry told him that it was up to the arresting officer but that he had to "answer some questions." The Defendant then said that he did not know "they were going over there to shoot up the house" and admitted that he was the driver. The Defendant denied shooting at the house and said Cuben did the shooting from the front window of the car.

The Defendant did not sign the "rights waiver" form until more than thirty minutes after his interrogation with Inv. Terry ended. Defense counsel did not attempt to suppress the August 2012 confession. The State did not attempt to introduce the video recording of the August 2012 confession into evidence, and trial counsel did not object to Inv. Terry's testimony about it at trial.

The Defendant was interrogated again in October 2012 for nearly six hours about a number of alleged offenses. At the start of the interrogation, the Defendant asked to speak to Inv. Terry alone because they had "built up a trust." After being advised of his Miranda rights again, the Defendant signed another "rights waiver" form. Inv. Terry then asked the Defendant about a separate, unrelated shooting. After approximately ten minutes, Inv. Terry began to question the Defendant about the shootings at issue in this case.

The Defendant told Inv. Terry that he wanted to go home, and Inv. Terry told him he would not go home until "[p]robably after [he] talked to the" assistant district attorney general, and she would ask if the Defendant had been "real" or "full of s--t." The Defendant then explained that he was trying "to get back in school" and stay "out of the way." Inv. Terry told the Defendant either he would be "charged with it" or it would be Cuben "that's gonna get charged with it."

Inv. Terry asked, "[Y]ou told me last time, who was driving?" The Defendant responded that he was the driver and that Cuben was in the car with him. Inv. Terry asked, "[H]ow'd y'all end up over there and why did [Cuben] shoot up the house?" The Defendant said that he could not remember and that he told him last time that Mr. Nail "and a couple of his boys" had come to Mechanicsville "looking." Inv. Terry then asked

the Defendant "who [was] this girl that all this s--t start over" and told the Defendant that he knew that the shootings started with the girl "pumping both of y'all f--king heads full of s--t." Inv. Terry also stated that he knew the Defendant participated in a robbery of Mr. Nail's younger brother.

The Defendant said that he "guess[ed]" that those were the reasons for the shootings. Inv. Terry told the Defendant, "[T]hat don't make sense." The Defendant repeated that the shootings happened after Mr. Nail "came to the Ville looking." Inv. Terry again said that what the Defendant had told him did not "seem like enough to actually shoot up a house." Inv. Terry then told the Defendant if Mr. Nail told a story that made "more sense," the prosecutor would conclude that the Defendant was "still bulls--ting," and she would make him "eat that charge."

After being questioned for approximately an hour, Inv. Wardlaw joined the Defendant and Inv. Terry in the interrogation room. Inv. Wardlaw knew the Defendant from his time as a School Resource Officer at the Defendant's school. Inv. Wardlaw confronted the Defendant with the 911 call from Ms. Nail stating that he committed the second shooting. Inv. Wardlaw then told the Defendant that he was "f--ked" and that this was his "last chance to straighten it out." Inv. Wardlaw explained that the Defendant did not "want to mess with" the prosecutor, that she would "eat [him] up," and that she was "gonna put [him] under the jail."

Inv. Wardlaw told the Defendant that he was "looking at some serious s--t . . ., some prison . . . fighting everyday for your life s--t . . ., some real clank, clank metal bar s--t." Inv. Wardlaw then told the Defendant he did not "want to put [the Defendant] in jail" but that the "ball [was] in [the Defendant's] court." Inv. Wardlaw explained that he knew the Defendant had committed numerous shootings; that if he did not talk to them, they would "send [his] ass back to jail"; and that the prosecutor would "eat [his] ass alive" and put him "in jail for the rest of [his] life." Inv. Wardlaw said that they were trying to help the Defendant "take some of these years off" so he would not be "locked up [un]til" he was fifty or sixty.

The Defendant asked to go home that day. Inv. Wardlaw explained to him that he was in jail on a probation violation warrant and that they could not help him with that. Inv. Terry then told the Defendant that if he decided not "to talk and be real" he could take his "rights waiver" form and keep it, so that when he was in prison for "decades," he could think about how they had tried to help him. Inv. Terry said that Mr. Nail would be coming in the next morning, and if the prosecutor believed him, the Defendant was "gonna be f--ked."

Inv. Wardlaw then implored the Defendant to tell them his "part" in the shootings and said the following:

-10-

You fixing to give yourself a damn near life sentence cause you want to sit here stone faced and think, "Aw, I ain't saying nothing, I'm going down like a soldier." You ain't going down like a soldier, you going down like a b---h. You fixing to be in jail, you fixing to fight every day. You a little dude Carlos, you ain't the same dude on the streets that you gonna be in the jail. Your name not gonna strike fear in people in the jail dude. You gonna come in there, you gonna be fresh face, a nineteen-year-old kid. Guess what's gonna happen? They coming at you every single day. You can stop that s--t right now, but if you want to sit here and keep this s--t up Carlos, ain't no help for you man. Last straw, I can get the whole story. I can take what I got, take it to the [prosecutor] and say, "He ain't say, he ain't want to talk, he didn't want to say nothing." Guess what she gonna say? "Fine with me, I'm fixing to put his ass under the jail." And guess what? She gonna put your ass under the jail.

The Defendant asked Inv. Wardlaw if he would let the prosecutor "do that." Inv. Wardlaw said that he did not "want her to," and Inv. Terry said that the Defendant was the one that was "about to let her do that." Inv. Wardlaw told the Defendant that they could not get any "charges dropped off" him, but they could go to the prosecutor and say "he was cool. . . he told the truth," and she would "take that into consideration." Inv. Wardlaw warned the Defendant that if they told the prosecutor he was "feeding [them] the same bulls--t," he would get the "same s--t" as Cuben and Quinton. The Defendant asked the investigators what Cuben and Quinton were getting, and Inv. Terry responded, "F--ked."

Inv. Wardlaw asked the Defendant if he wanted "to do a couple of years in prison" or decades in prison. Inv. Wardlaw told the Defendant that if he wanted "to play hard ball," he would "probably" be charged with attempted murder and was "looking at about . . . fifty years." Inv. Wardlaw continued by telling the Defendant that he was "throwing [his] life away" by staying silent. Inv. Wardlaw then implored the Defendant that he could "come back from" the shooting but that he had to tell them "what the hell's going on." The Defendant repeated that he just wanted to go home.

Inv. Wardlaw told the Defendant that he could not go home that day but that there was a chance he could go home after his probation revocation hearing. Inv. Wardlaw told the Defendant that he would come to his hearing but that his probation revocation had "nothing to do with" him or Inv. Terry. Inv. Wardlaw then said that he was going to talk to the prosecutor and that the Defendant should ask around the jail about her reputation because he would be told not to "f--k with her." Inv. Wardlaw told the Defendant that the prosecutor could "help [him] a whole lot" but if he stayed "hush, hush [and] stone face," he would be "f--ked" and go to prison.

At that point, Inv. Terry interjected the following, "And brother they gonna rape ya, they gonna f--king rape you. You are not a big man; you cannot fend them off. They will f--king rape you daily." Inv. Wardlaw reminded the Defendant that there were no guns in jail. The Defendant asserted that he could defend himself with his hands. Inv. Terry responded by telling the Defendant, "Your hands ain't gonna do you no good when you got [ten] my size coming at you. They don't come individually." Inv. Wardlaw agreed, saying that people were "cliqued up" in prison. He then asked the Defendant if he knew what he would have to do to get "cliqued up." Inv. Warldaw told the Defendant that he would have to "give them something" to get protection in jail.

Inv. Wardlaw continued, telling the Defendant that if he went to prison, he would have to fight "for the rest of [his] life . . . [n]ot just to keep from getting beat up, [but to] keep from getting [his] manhood took, to stay alive." The investigators then confronted the Defendant with all of the various charges he was facing for several shootings and robberies. After that, Inv. Wardlaw asked the Defendant where he was "at Wilder Place," and Inv. Terry said the Defendant was "[i]n the car." The Defendant then said he "was driving" and that he had already admitted that to Inv. Terry.

Inv. Terry told the Defendant that he had "witnesses" who said the Defendant was the shooter on August 15, 2012. The Defendant denied shooting either time and told the investigators that Cuben shot both times. Inv. Terry then explained that the Defendant had charges that "ain't coming off" and that he needed "to try to get charges off" by showing the prosecutor that he was "redeemable" and that he wanted to help himself. Otherwise, Inv. Terry told the Defendant, the prosecutor would believe Mr. Nail's version of events.

Inv. Terry then lied to the Defendant and told him that they had gotten fingerprints off the guns seized from Cuben. Inv. Terry warned the Defendant as follows:

> If I have to sit here and we have to drag the truth out of you, and you don't even bother to help yourself, then the [prosecutor's] gonna say, "F--k him, he's not redeemable, he does not need to be back out on the f--king streets." Now I don't know why you not saying what led up to all of this, but you're screwing yourself. I've been 100% real with you. You not a bad kid, you just make a string of f--ked up decisions. But the shooting s--t, it's gonna stop. Is somebody gonna pay for it? Yeah. Do you need to pay for it with your entire life? F--k no. Help yourself while you can.

The Defendant responded by telling Inv. Terry that he did not "want to pay for it all." Inv. Terry told the Defendant that he was "in a position now" where he could "pay a lot or [he could] pay a little." Inv. Terry then said, "who knows, hell, you may end up paying with f--king supervised probation for a long ass time." The Defendant repeated

-12-

that he did not "want to go to prison at all." Both Investigators Terry and Wardlaw responded by telling the Defendant that he "better start f--king explaining." Inv. Wardlaw then told the Defendant that he had a choice between talking to them and "a couple of years prison" or not talking and "life in prison." Inv. Wardlaw told the Defendant that he was doing the Defendant "a courtesy by not already putting these warrants on [his] ass" but that if he kept "bulls--ting" him, he would see the prosecutor the next day and say, "F--k him . . . charge him right now."

Approximately two hours into the interview, the portion that was played for the jury at trial began. When asked about what type of car he was driving during the shootings, the Defendant became hesitant. Inv. Terry became agitated and asked the Defendant why they had to "drag [him] to help [him]." Inv. Wardlaw then stated that he needed to leave by 6:00 p.m. and that he wanted the Defendant to be sent back to the jail by then so the Defendant could "get something to eat." The Defendant stated that he did not like the food at the jail, and Inv. Wardlaw asked him what he wanted. The Defendant responded that he wanted "[s]ome McDonald's."

Inv. Wardlaw said that they "might [could] make McDonald's happen, but if [the Defendant] keep having to back pedal," he would not get any McDonald's. Inv. Wardlaw asked the Defendant what he wanted from McDonald's and warned him to not "start back pedaling." Inv. Terry then told the Defendant that before they would get him food from McDonald's, they were "gonna finish up [the] first shooting" and that if the Defendant back pedaled on it, "ain't nobody going to no f--king McDonald's" and the Defendant could "go back to jail to eat that f--ked up jail food." The Defendant then started telling the investigators the details of the first shooting.

Later, the Defendant was hesitant to admit that a fourth person, a juvenile, was there for the second shooting. Inv. Wardlaw told the Defendant that the "more [he] lie[d] to [him], the more [his] money want[ed] to stay in [his] pocket," and the Defendant could go back to jail and "have to eat that s--t" food.

The investigators continued to question the Defendant for another three hours after the portion of the interrogation that was played for the jury. The investigators questioned the Defendant about a different shooting not related to this case. Later, Inv. Terry confronted the Defendant by telling him that he knew "for a fact" that the Defendant shot at least one time during the shootings at Wilder Place. The Defendant denied lying about not shooting. The Defendant asked again to go home. Inv. Wardlaw told the Defendant that he was probably not going home and that it would be up to his probation officer. Inv. Terry then told the Defendant that the prosecutor would determine his fate after his probation violation was dealt with and that, if he did not cooperate, he could stay in jail until his trial.

Inv. Wardlaw said that they did not know if the Defendant would go to jail and that he could possibly get probation. Inv. Terry then told the Defendant that "at this rate it ain't gonna happen." Almost four hours into the interrogation, Inv. Terry told the Defendant that he would get more "time" because he was "lying." Inv. Terry also told the Defendant that he was going to "get worse" than Cuben and Quinton because the prosecutor would not work with a liar. The investigators berated the Defendant for several minutes about the importance of telling the truth and how lying would cause him to stay in jail "the rest of [his] life." The Defendant then said that he "pray[ed]" the investigators would help him.

Inv. Wardlaw asked the Defendant again what happened at the house on Wilder Place. The Defendant said that they pulled up to the house and that Cuben, Quinton, and the juvenile[4] all started shooting. This time, the Defendant admitted that he shot at the house "three or four" times. The Defendant claimed that the gun he used was one of Cuben's guns and that Cuben gave him the gun when they got to the house. The Defendant explained that he was not familiar with guns and that "they had to get the safety off" for him. The Defendant was shown pictures of the guns seized from Cuben, but he was unable to identify the gun he used. Inv. Wardlaw then lied to the Defendant and told him that his fingerprints were on one of the guns seized from Cuben.

After the Defendant confessed to shooting at the Wilder Place house, Inv. Wardlaw left to get the Defendant his McDonald's. Inv. Terry lectured the Defendant about taking so long to confess. Inv. Terry also complained about having spent four hours questioning the Defendant on a Sunday, causing him to miss "every NFL game," lunch, church, and dinner. Inv. Terry told the Defendant that he did this to give the Defendant an opportunity "to help" himself. Inv. Terry also told the Defendant that, had he left without confessing, he would have "screwed" himself. Almost five hours into the interrogation, Inv. Wardlaw returned and gave the Defendant his food from McDonald's. The Defendant complained that Inv. Wardlaw got his order wrong. Inv. Wardlaw then questioned the Defendant about a couple of unrelated robberies while the Defendant ate. The interrogation, which began at 1:50 p.m., concluded at approximately 7:45 p.m.

Inv. Wardlaw testified at the suppression hearing that he assisted Inv. Terry in the October 2012 interrogation because Cuben had implicated the Defendant in a different shooting that he was investigating. Inv. Wardlaw admitted that he told the Defendant he would go "down like a b---h" if he kept refusing to talk. Inv. Wardlaw explained that he meant that that the Defendant's reputation would not "mean anything" in prison. Inv. Wardlaw also admitted that he and Inv. Terry told the Defendant that he would be

---

[4] Earlier, the Defendant stated that he could not recall if the juvenile had been at the August 13, 2012 shooting but that he was at the August 15, 2012 shooting.

attacked and raped in prison. Inv. Wardlaw justified these statements by testifying that it was true that such things happened in prison.

Inv. Wardlaw explained that his statement to the Defendant that he was going to have "to give them something" to survive in prison meant that the Defendant was "probably going to have to have sex with [other inmates] if he wants to not be beat up or killed." Inv. Wardlaw testified that even after all of these statements were made, the Defendant did not "come out and admit all this stuff." Inv. Wardlaw further testified that he did not think telling the Defendant he would be raped daily in prison scared him. Inv. Wardlaw also claimed that it would not bother him if someone threatened him with being raped daily.

Inv. Wardlaw testified that he offered to get the Defendant McDonald's after the Defendant "said he had missed . . . dinner at the jail" and was hungry. Inv. Wardlaw claimed that he "offered to go get him something, since [the]y had had him there and he'd missed dinner." Inv. Wardlaw claimed that he could not remember if he left to get the food after the Defendant admitted his involvement in the Wilder Place shootings. Inv. Wardlaw incorrectly claimed that he left when the Defendant "started talking about the shooting on Wilder Place" because he "wasn't working that shooting."

The Defendant testified that he was nineteen years old at the time of the suppression hearing. The Defendant admitted that he signed the "rights waiver" form and agreed to talk to the investigators. The Defendant testified that he did not plan to tell the investigators "the truth" about the shootings because he "didn't want to show [his] involvement." The Defendant also testified that for the first hour or two of the interrogation he was "lying about every situation."

The Defendant claimed that he only told the investigators about his "involvement" in the shootings after they told him "that [he] was a very small guy and that every single day [he] was going to have to fight for [his] manhood not to be [taken,] [a]nd that a group of big guys was going to hold [him] down every day and rape [him], take turns." The Defendant testified that, when he heard this, he "[b]ecame terrified" and that "[a]ll [he] could think about was . . . getting raped." The Defendant claimed that he would not have told the investigators "the truth" if they had not made those comments.

The Defendant admitted that he spoke to Inv. Terry in August 2012 and that he told Inv. Terry that he drove the car for at least one of the Wilder Place shootings. The Defendant also admitted that he did not immediately confess after being told he would be raped daily in prison. The Defendant explained that he "couldn't think" after those comments, that his "mind was going everywhere," and that all he could "think about was just being raped." The Defendant estimated that it was five minutes after those comments that he "started admitting stuff." On re-cross examination, the Defendant

admitted that he shot at the house on Wilder Place. The Defendant also admitted during questioning by the trial court that he never thought if he confessed he "wouldn't get raped."

The trial court issued a written order denying the Defendant's motion to suppress. The Defendant's motion to suppress only challenged the statements alluding to physical violence and rape in prison. The trial court found that the investigators' statements "about the [D]efendant being attacked and raped in prison" were "coercive in their nature when combined with inferences of leniency in exchange for a statement." However, the trial court concluded that the statements "did not have a coercive effect on the [D]efendant or overbear the [D]efendant's will."

The trial court noted that the Defendant's "demeanor" and "body language remained the same" after Inv. Terry made the rape comments. The trial court also noted that the Defendant did not admit to anything until after several minutes had passed and that, when he did make a confession, it was "not different from what he had been telling the investigators for the [previous] two months." The trial court further reasoned that the Defendant "appeared to have complete control of his reasoning and will" and that he "continued to vehemently deny many of the accusations" the investigators were making even after the rape comments were made.

At trial, both Investigators Terry and Wardlaw testified that the Defendant never admitted to shooting at the Wilder Place house during the October 2012 interrogation in direct contradiction to the video recording of the interrogation. Inv. Terry testified that during the first "hour and a half" of the interrogation, the Defendant "wasn't denying anything that [the Defendant] had told [him] from the first interview." Inv. Terry claimed that he was not threatening the Defendant when he brought up the subject of prison rape but insisted that he was just "giving [the Defendant] simply the realities of what often happens in prison." Inv. Terry further explained that even though he had a good rapport with the Defendant, he changed his tone to try and "keep [the Defendant] rolling."

*B. Standard of Review*

In reviewing a suppression issue, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court." State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id.

Additionally, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Id.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Likewise, article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." "During a custodial interrogation, state agents must affirmatively advise an individual of his right to remain silent and of the consequences of his failure to assert that right." State v. Smith, 933 S.W.2d 450, 453 (Tenn. 1996) (citing Miranda, 384 U.S. at 467-69). A defendant may waive these rights "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444. Here, there is no dispute that the Defendant made a voluntary, knowing, and intelligent waiver of his rights at the start of the October 2012 interrogation.

However, the question of whether a confession was voluntary "remains distinct from Miranda." State v. Climer, 400 S.W.3d 537, 568 (Tenn. 2013) (citing Dickerson v. United States, 530 U.S. 428, 434-35 (2000)). The voluntariness test "recognizes that coerced confessions are inherently unreliable" and examines "whether a suspect's will was overborne so as to render the confession a product of coercion." Id. at 567-68 (citing Dickerson, 530 U.S. at 433-35). The test for voluntariness under article I, section 9 of the Tennessee Constitution "is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." Smith, 933 S.W.2d at 455.

For a confession to be voluntary, it "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." Smith, 933 S.W.2d at 455 (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)). "[T]he particular circumstance of each case must be examined as a whole." Id. (citing Monts v. State, 400 S.W.2d 722, 733 (1966)). The "defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense." Id. Instead, "coercive police activity is a necessary predicate to finding that a confession is not voluntary." Id. (quoting State v. Brimmer, 876 S.W.2d 75, 79 (Tenn. 1994)).

"The critical question is 'whether the behavior of the state's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" Smith, 933 S.W.2d at 455-56 (quoting State v. Kelly, 603 S.W.2d 726, 729 (Tenn. 1980)). Factors relevant to this determination include:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and

prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep[,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

Climer, 400 S.W.3d at 568 (alterations in original) (quoting State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996)).

## *C. Objectively Coercive Tactics*

Recently, the Kentucky Supreme Court addressed a situation similar to the one at issue here. In that case, the police officers "made several inappropriate allusions to prison violence or rape throughout the interrogation" of a seventeen-year-old defendant. Dye v. Commonwealth, 411 S.W.3d 227, 234 (Ky. 2013). The Kentucky Supreme Court held that "attempting to persuade a seventeen-year-old that a confession is the only way he will avoid daily prison assault—sexual or otherwise—is 'objectively coercive.'" Id. We agree with the Kentucky Supreme Court's holding.

Investigators Terry and Wardlaw's comments that the Defendant would have to fight every day to "stay alive" in prison, that other inmates would "f--king rape [him] daily," and that he would have to prostitute himself out to other inmates for protection were not, as Inv. Terry suggested at trial, made to give the Defendant "simply the realities of what often happens in prison." Rather, the investigators made these statements to the Defendant in an attempt to frighten, intimidate, and coerce him into confessing against his will.

The Defendant also argues that the investigators' threats "to tell the prosecutor that he was uncooperative" were coercive. "Promises of leniency by state officers do not render subsequent confessions involuntary per se." Smith, 933 S.W.2d at 455. Rather, the Fifth Amendment condemns only "promise-induced" confessions "which are compelled by promises of leniency." Id. (emphasis in original) (quoting Kelly, 603 S.W.2d at 729). This court has previously stated that

One of the main factors in determining whether promises of leniency compelled a suspect's confession is whether law enforcement officials or other State agents made specific promises of leniency (i.e., treatment or a reduced sentence) in return for the suspect's statements or threatened the

suspect with prosecution (or a more severe sentence) should he not cooperate.

State v. Cyntoia Denise Brown, No. M2007-00427-CCA-R3-CD, 2009 WL 1038275, at *21 (Tenn. Crim. App. Apr. 20, 2009) (emphasis added).

Investigators Terry and Wardlaw never made a specific promise of leniency to the Defendant. Instead, they only provided generalized statements that he would serve "a few years," much less time, or possibly be placed on probation. However, the investigators made several specific statements to the Defendant that his lack of cooperation would result in a more severe sentence. They told the Defendant that if they told the prosecutor that he did not cooperate, she would "put [his] ass under the jail," that he would spend his life in prison, and that he would get a sentence of fifty years if he did not cooperate. These threats went beyond mere generalities and were designed to compel the Defendant to confess against his will; therefore, this tactic was also objectively coercive.

With respect to the Defendant's claim that his confession was coerced by "promises of food," we note that Inv. Wardlaw's offer to get the Defendant McDonald's did not arise until after the Defendant had already confessed to being present at both shootings. Furthermore, the Defendant was not denied food in attempt to cause him to confess. Inv. Wardlaw stated that they needed to send the Defendant back to the jail so he could eat, and the Defendant complained about the food at the jail. It was only after the Defendant complained about the jail food that Inv. Wardlaw offered to buy the Defendant something from McDonald's. Accordingly, we conclude that this tactic was not objectively coercive.

### D. Overbearing Defendant's Will and Causing Confession

Having concluded that the investigators employed coercive tactics while interrogating the Defendant, we must now address whether those tactics overbore the Defendant's will and caused him to confess. We agree with the trial court's conclusion that they did not. The Defendant had previously told Inv. Terry that he was the driver for at least one of the shootings on Wilder Place. At the outset of the October 2012 interrogation, the Defendant again admitted to driving the car during the shootings. The Defendant also stated that he "guessed" the shootings were caused by the robbery of Mr. Nail's brother and Mr. Nail coming to the Defendant's neighborhood "looking."

While the Defendant provided a more detailed description of the crimes after the coercive tactics were employed, his confession, which was played for the jury, was essentially the same as his initial statements to Inv. Terry. It was only much later in the interview that the Defendant confessed to actually shooting at the house. However, the

-19-

State never attempted to admit this portion of the interrogation at trial, and both investigators incorrectly testified that the Defendant never confessed to shooting at the house during the October 2012 interrogation.

Had the State attempted to introduce that part of the interrogation, the question of whether the investigators' coercive tactics overbore the Defendant's will would likely have been answered in the affirmative. But given that the Defendant had previously confessed to Inv. Terry and that his statements after the coercive tactics were employed were similar to statements he had made earlier in the interrogation, we agree with the trial court's conclusion that the coercive tactics did not overbear the Defendant's will and cause his confession.

### E. Harmless Error

Furthermore, even if the trial court had erred in denying the Defendant's suppression motion, any possible error would have ultimately been harmless. See Tenn. R. App. P. 36(b) (providing that a final judgment "shall not be set aside" unless the error "more probably than not affected the judgment"). The Defendant made no attempt to challenge his initial confession to Inv. Terry in August 2012 and did not object to Inv. Terry's testimony regarding that confession. The Defendant also did not object to Inv. Wardlaw's testimony regarding his subsequent confession, under oath, at the suppression hearing. While we are deeply troubled by the improper methods used by Investigators Terry and Wardlaw to question the Defendant, we are nonetheless constrained under these circumstances to affirm the trial court's denial of the Defendant's suppression motion.

### II. Impermissible Rule 404(b) Evidence

The Defendant contends that the portion of his October 2012 confession played at trial contained impermissible evidence of other bad acts. The Defendant specifically argues that the references to the robbery of Mr. Nail's brother "resulted in increased danger of unfair prejudice" and should have been excluded. The State responds that the Defendant has waived full appellate review of this issue by failing to include it in his motion for new trial and that plain error review is not warranted.

Prior to trial, trial counsel filed a motion to redact the Defendant's October 2012 confession to remove any references to "other crimes, alleged bad acts, and ongoing investigations." The State submitted the portion of the confession it planned to introduce at trial, and the trial court ruled that the redacted confession was admissible despite "some references . . . to gang activity" because those references were probative as to the Defendant's motive and intent to commit the charged offenses.

The portion of the interrogation played for the jury began with Inv. Wardlaw telling the Defendant that he had the Defendant "on a case" and that Inv. Terry had the Defendant "on another case." Inv. Wardlaw also said that he knew "about when y'all came through the P shooting too, but we ain't even talking about that, there's no report made on that." Later, Inv. Wardlaw insisted that a juvenile was with the Defendant "the day when [the Defendant] took [Mr. Nail's brother's] phone." The Defendant talked extensively about the robbery of Mr. Nail's brother during this portion of the interrogation, at first claiming only to have heard about details of the robbery but later admitting to being in the car when the robbery occurred. At another point during this portion of the interrogation, Inv. Wardlaw stated that there were actually three shootings at the house, but only two were reported.

After the confession was played for the jury, trial counsel objected and moved for a mistrial. Trial counsel argued that the statements about the robbery of Mr. Nail's brother were "[u]ncharged conduct" and "extremely prejudicial." Trial counsel also objected to Inv. Terry's statement that after the first shooting, his "phone was blowing up" with messages that the Defendant, Cuben, and Quinton "shot up that house." The trial court overruled the Defendant's objection and denied his motion for a mistrial. The trial court stated that there was no issue with Inv. Terry's statement because it referred to the first shooting on Wilder Place and not "any other bad acts." The trial court also reaffirmed its earlier ruling that the statements about the robbery went to the Defendant's motive and intent to commit the offenses. Trial counsel did not include this issue in the Defendant's motion for new trial.

The Defendant's failure to include this issue in his motion for new trial has waived full appellate review by this court. See Tenn. R. App. P. 3(e). As such, we will only examine this issue to determine whether plain error review is appropriate. The doctrine of plain error applies when all five of the following factors have been established:

> (a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached;
> (c) a substantial right of the accused must have been adversely affected;
> (d) the accused must not have waived the issue for tactical reasons; and
> (e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231.

At the outset, we note that "rarely will plain error review extend to an evidentiary issue." State v. Jonathan Mitchell Grimes, No. W2014-00786-CCA-R3-CD, 2015 WL

3929694, at *10 (Tenn. Crim. App. June 26, 2015) (quoting State v. Ricky E. Scoville, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (Tenn. Crim. App. Sept. 11, 2007)). Plain error review is not warranted for this issue because a clear and unequivocal rule of law has not been breached. While evidence of a person's prior bad acts are not admissible to prove his character and to show that his actions were in conformity with that character, see Tennessee Rule of Evidence 404(b), otherwise inadmissible conduct may be offered to prove the motive of the defendant or intent. See State v. Toliver, 117 S.W.3d 216, 230 (Tenn. 2003). Here, there was an ongoing feud between the Defendant and Mr. Nail. We agree with the trial court's conclusion that the robbery of Mr. Nail's brother was one of several precipitating events in this feud that led to the shootings and was admissible to establish the Defendant's motive and intent. As such, plain error review of this issue is not warranted.

### III. Corroboration of the Defendant's Confessions

The Defendant contends that there was no evidence to corroborate his confessions. The Defendant argues that the State failed to present any physical evidence connecting him to the offenses. The Defendant further argues that the only victim to testify, Ms. Nail, testified that she slept through the first shooting and "did not see the perpetrator or perpetrators or even a vehicle in the area" during the second shooting. The State responds that the Defendant's confessions were corroborated by his testimony at the suppression hearing.

Under Tennessee law, "a person cannot be convicted solely on the basis of an uncorroborated extrajudicial confession." State v. Bishop, 431 S.W.3d 22, 61 (Tenn. 2014). However, "[a] statement made under oath in open court . . . requires no independent corroboration." Id. "An infrajudicial statement can therefore serve as corroboration for an extrajudicial one." Id. (citing 7 John H. Wigmore, Evidence § 2071, at 524 (Chadbourn Rev. 1978)). Here, the Defendant testified at the suppression hearing that he was not only present for the shootings but actually shot at the house on Wilder Place.

When a defendant testifies at a pretrial hearing in an attempt to vindicate a constitutional right "his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection." Simmons v. United States, 390 U.S. 377, 394 (1968) (emphasis added) (regarding testimony to support a suppression motion on Fourth Amendment grounds); see also United States v. Garcia, 721 F.2d 721, 723 (11th Cir. 1983) (applying Simmons to a pre-trial double jeopardy hearing). Trial counsel made no objection to Inv. Wardlaw's testimony regarding the Defendant's confession during his suppression hearing testimony; therefore, those statements could be used to corroborate the Defendant's extrajudicial confessions. Accordingly, we conclude that this issue is without merit.

-22-

## IV. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his convictions. The Defendant argues that the evidence was insufficient to sustain his convictions for attempted first degree murder because there "was no evidence presented at trial to support a finding of intent to kill . . . anyone inside the residence." With respect to the Defendant's conviction for employing a firearm during the commission of a dangerous felony, the Defendant argues that there was no evidence that the Defendant "possessed a firearm." Finally, with respect to the misdemeanor reckless endangerment convictions, the Defendant argues that "there was no evidence presented at trial that anyone was placed in imminent danger of death or serious bodily injury." The State responds that the evidence was sufficient to sustain the Defendant's convictions.

### A. Standard of Review

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. <u>See</u> <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." <u>Bland</u>, 958 S.W.2d at 659; <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." <u>State v. Cooper</u>, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." <u>State v. Williams</u>, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." <u>State v. Pendergrass</u>, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. <u>State v. Dorantes</u>, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected

the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971)) (internal quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

*B. Attempted First Degree Murder*

As relevant to this case, first degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result" Tenn. Code Ann. § 39-11-302(a).

> Premeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d) (internal quotation marks omitted).

As pertinent to our review, a person commits criminal attempt when, "acting with the kind of culpability otherwise required for the offense," the person "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." Tenn. Code Ann. § 39-12-101(a)(2).

The Defendant's attempted first degree murder convictions arose from the August 15, 2012 shooting. On appeal, the Defendant limits his arguments to alleging that there was no evidence to connect him to the shooting and no evidence "to support a finding of intent." With respect to his claim that there was no evidence to connect the Defendant to the shooting, the Defendant's own confessions belie this claim. The Defendant told Investigators Terry and Wardlaw in the October 2012 interrogation that he drove Cuben, Quinton, and a juvenile to the Wilder Place house because Quinton had told them that Mr. Nail was at the house.

-24-

The jury was charged on criminal responsibility for the conduct of another, and the convictions could be sustained on such a theory. See Tenn. Code Ann. § 39-11-402(2) (providing for criminal culpability when a person acts "with intent to promote or assist the commission of the offense" and aids another person in the commission of the offense). Furthermore, the Defendant testified at the suppression hearing that he actually shot at the house. These confessions provided sufficient evidence to connect the Defendant to the August 15, 2012 shooting.

With respect to the Defendant's argument that there was no proof of intent, the Defendant cites to State v. Wilson, 924 S.W.2d 648 (Tenn. 1996), and argues that there was no intent to kill the victims because the Defendant could not "have known the house was occupied." In Wilson, our supreme court held that the evidence was insufficient to support the defendant's aggravated assault convictions because the State failed to prove that the defendant acted knowingly or intentionally when he shot at a house on a Tuesday afternoon, with no cars present in front of the house, and no "lights, noises, or other signs" to "indicate to a passerby that the house was occupied." Id. at 652. The facts of this case are distinguishable from Wilson.

To begin with, the Defendant detailed in his October 2012 confession that the August 15, 2012 shooting occurred after Mr. Nail came to Mechanicsville "two cars deep," "strapped up," and "looking for" the Defendant, Cuben, and Quinton. The Defendant also claimed that Mr. Nail had threatened to shoot him in the past and that "they shot . . . at [him] on the east side." More importantly, the Defendant stated that they went to the Wilder Place house in retaliation that night because Quinton told them that Mr. Nail was there. Our supreme court has explained that the first degree murder statute "simply requires proof that the defendant's conscious objective was to kill a person, i.e., 'cause the result.'" Millen v. State, 988 S.W.2d 164, 168 (Tenn. 1999). Therefore, "if the evidence demonstrates that the defendant intended to 'cause the result,' the death of a person, and that he did so with premeditation . . ., then the killing of another, even if not the intended victim (i.e., intended result), is first degree murder." Id.

Furthermore, unlike Wilson, these offenses occurred at approximately 2:30 in the morning. Although Ms. Nail testified that there were no cars parked in front of the house and that the house had dark curtains, she also testified that she and Ms. Clemons were awake with several lights on in the house. Ms. Clemons and Ms. Nail were sitting on a couch pushed up against a window in the living room. While there were shots throughout the house, the majority were focused on the living room, specifically the area where the couch was located. At least three different guns were used during this shooting. Based upon the foregoing, we conclude that the evidence was sufficient to sustain the Defendant's convictions for attempted first degree murder.

*C. Employing a Firearm During the Commission of a Dangerous Felony*

"It is an offense to employ a firearm during the . . . [c]ommission of a dangerous felony." Tenn. Code Ann. § 39-17-1324(b)(1). Attempted first degree murder is one of the enumerated dangerous felonies listed in the statute. Tenn. Code Ann. § 39-17-1324(i)(1)(A). This offense also arises out of the August 15, 2012 shooting. The Defendant argues that "there was no evidence presented at trial that [he] possessed a firearm" during the shooting.

There is significant direct and circumstantial evidence that the Defendant employed a firearm during the August 15, 2012 shooting. The Defendant admitted to shooting at the house during the suppression hearing, and Inv. Wardlaw testified to that effect at trial. Furthermore, the house on Wilder Place "was riddled with gunshots" after the shooting, and at least three guns were used during the shooting according to subsequent forensic testing. Accordingly, we conclude that the evidence is sufficient to sustain the Defendant's conviction for employing a firearm during the commission of a dangerous felony.

*D. Misdemeanor Reckless Endangerment[5]*

Misdemeanor reckless endangerment occurs when a person "recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." Tenn. Code Ann. § 39-13-103(a). A person acts recklessly "with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." Tenn. Code Ann. § 39-11-106(a)(31). "The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." Id.

With respect to reckless endangerment, the threat of death or serious bodily injury must be "imminent"; therefore, "the person must be placed in a reasonably probability of danger as opposed to a mere possibility of danger." State v. Payne, 7 S.W.3d 25, 28 (Tenn. 1999). Moreover, "the term 'zone of danger' may be employed to define that area in which a reasonable probability exists that the defendant's conduct would place others in imminent danger of death or serious bodily injury if others were present in that zone or area." Id. The Defendant argues that "there was no evidence presented at trial that

---

[5] Ultimately, we reverse the Defendant's misdemeanor reckless endangerment convictions on other grounds. However, we will address the Defendant's argument with respect to the sufficiency of the convicting evidence so as not to pretermit the issue. See State v. Parris, 236 S.W.3d 173, 189 (Tenn. Crim. App. 2007) (following a similar procedure).

anyone was placed in imminent danger of death or serious bodily injury" during the August 13, 2012 shooting.

Ms. Nail testified that on August 13, 2012, there were a total of five people inside the Wilder Place house. Ms. Nail testified that she fell asleep on the couch after everyone else had coupled off into the house's two bedrooms. This court has previously held that "the mere act of discharging a gun into the air, standing alone, is not sufficient to constitute the commission of reckless endangerment." State v. Terrance Shaw, No. W2010-00201-CCA-R3-CD, 2011 WL 2176561, at *4 (Tenn. Crim. App. June 1, 2011). Here, the Defendant and his companions specifically targeted the house and cars parked in front of it. While the majority of the bullets struck the two cars parked outside the house, at least two bullets struck the house itself. We conclude that this was sufficient to place the occupants of the house within the "zone of danger"; therefore, the evidence was sufficient to sustain the misdemeanor reckless endangerment convictions.

*V. Sentencing Issues*

*A. Length of Attempted First Degree Murder Sentences*

The Defendant contends that the trial court erred in setting the length of his sentences for attempted first degree murder above the minimum. The Defendant argues that the trial court either misapplied or placed too much weight on all of the enhancement factors it applied to the Defendant's sentence. The State responds that the trial court did not abuse its discretion in sentencing the Defendant to mid-range sentences for each conviction.

Appellate courts are to review "sentences imposed by the trial court within the appropriate statutory range . . . under an abuse of discretion standard with a presumption of reasonableness." State v. Bise, 380 S.W3d 682, 709 (Tenn. 2012) (internal quotation marks omitted). A sentence will be upheld "so long as the statutory purposes and principles [of the Sentencing Reform Act] . . . have been properly addressed." Id. at 706. If this is true, this court may not disturb the sentence even if a different result were preferred. State v. Carter, 254 S.W.3d 335 (Tenn. 2008). Even if the trial court has misapplied an enhancement or mitigating factor, the sentence will be upheld if "there are other reasons consistent with the purposes and principles of sentencing, as provided by statute . . . ." Bise, 380 S.W.3d at 706. On appeal, the burden is on the defendant to show that the sentence is improper. Tenn. Code Ann. § 40-35-401(d).

The Sentencing Reform Act was enacted in order "to promote justice" by ensuring that every defendant "be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102. In order to implement the purposes of the Sentencing Reform Act, trial courts must consider several

sentencing principles. The sentence imposed for an offense "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4). Sentences involving incarceration "should be based on the following considerations":

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(2). Trial courts should consider the "potential or lack of potential for the rehabilitation or treatment of the defendant" when "determining the sentence alternative or length of term to be imposed." Tenn. Code Ann. § 40-35-103(5).

With respect to enhancement factor (1), that the Defendant had a history of criminal convictions or behavior in addition to those necessary to establish the appropriate range, the Defendant argues that his convictions for simple possession of marijuana were "minor, and do not warrant an enhancement under the circumstances of this case." However, this court has long held that misdemeanor convictions may be used to enhance a defendant's sentence under enhancement factor (1). See State v. Massey, 757 S.W.2d 350, 352 (Tenn. Crim. App. 1998). Furthermore, the trial court stated that it gave little weight to this factor.

The Defendant argues that the trial court misapplied enhancement factor (8) because there was no evidence that the Defendant "was on probation at the time of the instant offense[s]." Enhancement factor (8) provides for the enhancement of a defendant's sentence when the defendant, "before trial or sentencing, [has] failed to comply with the conditions of a sentence involving release into the community." As the State correctly notes in its brief, this factor does not require the Defendant to have been on probation at the time of the offenses.

Instead, enhancement factor (8) requires the Defendant to have, prior to trial or sentencing, failed to comply with a sentence involving release into the community. The trial court did not err in applying this factor as the record reflects that the Defendant had previously violated the terms of a probationary sentence for one of his juvenile delinquency adjudications. See State v. Deshaun Emmanuel Brown, M2011-01383-CCA-R3-CD, 2012 WL 6115603, at *9 (Tenn. Crim. App. Dec. 10, 2012) (stating that

-28-

the "violation of prior juvenile court probationary terms can be used to enhance a sentence").

The trial court placed "a strong amount of consideration" on enhancement factor (16), that the Defendant was adjudicated to have committed delinquent acts as a juvenile that would constitute a felony if committed by an adult. The Defendant argues that use of this factor was not warranted "in the circumstances of this case" because the Defendant's juvenile record reflected that he had not committed any serious offenses since 2010. However, the Defendant's juvenile history reflects a pattern of increasingly violent behavior including adjudications for aggravated robbery, aggravated assault, and reckless endangerment with a deadly weapon. Enhancement factor (16) was clearly applicable here, and the trial court was justified in placing great weight on this factor.

The Defendant argues that the trial court misapplied enhancement factor (13), that the Defendant was released on bail at the time he committed the offenses. The Defendant argues that there is nothing in the record to establish that the Defendant was on bail for simple possession of marijuana when he committed the offenses at issue in this case. However, the record does reflect that the Defendant committed one of the simple possession offenses on March 28, 2012, and that the charge was not resolved until the Defendant pled guilty on August 20, 2012. Given that the simple possession offense occurred before the offenses at issue in this case and was not resolved until after these offenses, we do not believe that the trial court erred in applying enhancement factor (13).

The Defendant also argues that the trial court misapplied enhancement factor (3), that the offense involved more than one victim. We agree with the Defendant. Our supreme court has held that enhancement factor (3) does not apply where separate convictions "may be obtained based upon specific, named victims." State v. Imfeld, 70 S.W.3d 698, 705-06 (Tenn. 2002). Here, each conviction was based upon a specific, named victim; therefore, enhancement factor (3) was not applicable to the Defendant's attempted first degree murder convictions.

However, a within range sentence imposed by the trial court will be upheld even if the trial court misapplied an enhancement factor so long as the trial court has not "wholly departed from" the Sentencing Reform Act and there are "other reasons consistent with the purposes and principles of sentencing" to support the sentence. Bise, 380 S.W.3d at 706. The trial court properly used four enhancement factors to justify imposing mid-range sentences for the Defendant's attempted first degree murder convictions. These provided a sufficient basis for the trial court's decision despite the fact that the trial court misapplied enhancement factor (3). As such, we conclude that the trial court did not abuse its discretion in sentencing the Defendant to twenty years for each attempted first degree murder conviction.

*B. Consecutive Sentences*

The Defendant contends that the trial court erred in imposing partial consecutive sentences. The Defendant argues that "[g]iven his lack of any serious adult criminal history and the length of time since [he] had been adjudicated delinquent for a serious offense as a juvenile, [the Defendant's] criminal history was not so extensive as to justify consecutive sentencing." The Defendant further argues that the trial court erred in finding him to be a dangerous offender. The State responds that the trial court did not abuse its discretion in imposing partial consecutive sentences.

When reviewing a trial court's imposition of consecutive sentences, "the presumption of reasonableness applies," which gives "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." State v. Pollard, 432 S.W.3d 851, 861 (Tenn. 2013). "Any one of [the] grounds [listed in section 40-35-115(b)] is a sufficient basis for the imposition of consecutive sentences." Id. at 862 (citing State v. Dickson, 413 S.W.3d 735 (Tenn. 2013)).

Here, the trial court concluded that the Defendant was an offender whose record of criminal activity was extensive and that he was a dangerous offender. See Tenn. Code Ann. § 40-35-115(b)(2), (4). Contrary to the Defendant's assertions on appeal, his record of criminal activity was extensive. This court has repeatedly "approved the consideration of a defendant's history of juvenile adjudications in determining whether a defendant has an extensive record of criminal activity for consecutive sentencing purposes." Lamario Sumner a/k/a Lamario Flemming v. State, No. W2009-00453-CCA-R3-PC, 2010 WL 4544955, at *8 (Tenn. Crim. App. Nov. 10, 2010). From 2007 to 2010 the Defendant was adjudicated delinquent for committing aggravated robbery, aggravated assault, reckless endangerment with a deadly weapon, conspiracy to commit aggravated robbery, two vandalism offenses, and unlawful possession of a weapon. The Defendant also had a probationary sentence revoked in 2008. Additionally, the Defendant had two convictions for simple possession of marijuana as an adult. Accordingly, the trial court did not abuse its discretion in imposing partial consecutive sentences in this case.[6]

*VI. Misdemeanor Reckless Endangerment As Lesser-Included Offense of Attempted First Degree Murder*

---

[6] Because only one of the grounds listed in section 40-35-115(b) is needed to justify consecutive sentencing, we need not determine whether the trial court properly concluded that the Defendant was a dangerous offender.

At oral arguments, we instructed the parties to submit supplemental briefs on the issue of whether misdemeanor reckless endangerment is a lesser-included offense of attempted first degree murder. We did so in light of this court's recent opinion in State v. John J. Ortega, Jr., No. M2014-01042-CCA-R3-CD, 2015 WL 1870095 (Tenn. Crim. App. Apr. 23, 2015). In Ortega, a panel of this court determined that the General Assembly's 2009 amendment to Tennessee Code Annotated section 40-18-110 codified parts (a) and (c) of the test to determine what offenses constitute lesser-included offenses enunciated by our supreme court in State v. Burns, 6 S.W.3d 453 (Tenn. 1999). Id. at *7-8. However, the General Assembly failed to codify part (b) of the Burns test, which addressed "different mental states and less serious harm or risk of harm." Id. at *8. As such, the Ortega panel concluded that the failure to include part (b) in the 2009 amendment to section 40-18-110 abrogated that part of the Burns test. Id. at *8-11.

The Defendant contends that, as of the 2009 amendment, misdemeanor "reckless endangerment is no longer a lesser[-]included offense" of attempted first degree murder; therefore, his five convictions for misdemeanor reckless endangerment should be reversed and dismissed. The State "acknowledges that misdemeanor reckless endangerment does not fit comfortably within [section] 40-18-110's definition of a lesser-included offense as for the charged offense of attempted first-degree murder."

However, the State responds that we should affirm the convictions because this court has repeatedly "accept[ed] misdemeanor reckless endangerment as a lesser-included offense of attempted first degree murder" since the 2009 amendment to section 40-18-110. The State also argues that we should examine this issue under a plain error analysis and that plain error review is not warranted in this case. The State further responds that the Defendant consented "to an effective amendment of the indictment by actively seeking a jury instruction on misdemeanor reckless endangerment" and by trial counsel arguing that the Defendant's conduct "was reckless rather than premeditated" during his closing argument.

We agree with the Ortega panel's conclusion that the 2009 amendment to section 40-18-110 abrogated part (b) of the Burns test. As pointed out in Ortega, the General Assembly has the "power to define what shall constitute a criminal offense" and, "by implication, what is a lesser included offense of a given crime." Ortega, 2015 WL 1870095, at *9. Misdemeanor reckless endangerment was held to be a lesser-included offense of attempted first degree murder specifically under part (b) of the Burns test. See State v. Rush, 50 S.W.3d 424, 432 (Tenn. 2001). Accordingly, as of the 2009 amendment to section 40-18-110, misdemeanor reckless endangerment is no longer a lesser-included offense of attempted first degree murder. Therefore, we conclude that the trial court erred by instructing the jury on misdemeanor reckless endangerment.

-31-

The State notes that this court has repeatedly "accept[ed] misdemeanor reckless endangerment as a lesser-included offense of attempted first degree murder" since the 2009 amendment to section 40-18-110. See State v. Deanty Montgomery, No. E2014-01014-CCA-R3-CD, 2015 WL 3409485, at *4, 12 (Tenn. Crim. App. May 28, 2015); State v. Billy Lebron Burson, No. E2012-01289-CCA-R3-CD, 2013 WL 4470595, at *7 (Tenn. Crim. App. Aug. 20, 2013); State v. Jonathan Everett, No. W2008-01578-CCA-R3-CD, 2011 WL 1304893, at *3, 9 (Tenn. Crim. App. Apr. 4, 2011); State v. Korey Bradley, No. W2009-02024-CCA-R3-CD, 2011 WL 3689032, at *1 (Tenn. Crim. App. Aug. 22, 2011). However, "[n]one of these cases directly raised" the issue of whether misdemeanor reckless endangerment was a lesser-included offense of attempted first degree murder. Ortega, 2015 WL 1870095, at *10 n.5.

The State urges us to review this issue under the rubric of plain error and urges that plain error review is not warranted. However, charging the jury with an offense that is not a lesser-included offense of the principal offense charged in the indictment without the Defendant's implicit consent acts as an invalid amendment to the indictment because it violates a defendant's constitutional right to "receive fair and reasonable notice prior to trial of the offense for which he is charged." State v. Mario C. Gray a/k/a Ricky Fletcher, No. M2006-00398-CCA-R3-CD, 2007 WL 4547970, at *12 (Tenn. Crim. App. Dec. 17, 2007).

"A valid indictment is an essential jurisdictional element, without which there can be no prosecution." Dykes v. Compton, 978 S.W.2d 528, 529 (Tenn. 1998). Tennessee Rule of Appellate Procedure 13(b) generally limits this court's review to "those issues presented for review." However, Rule 13(b) provides that this court "shall also consider whether the trial and appellate court have jurisdiction over the subject matter, whether or not presented for review." (Emphasis added); see also Ortega, 2015 WL 1870095, at *7 (holding that failure to object to an erroneous lesser-included offense jury instruction does not waive the issue). Accordingly, the State's argument regarding plain error review is without merit.

The State also urges us to affirm the misdemeanor reckless endangerment convictions because the Defendant "consented to an effective amendment of the indictment." Charging the jury with an offense that is not a lesser-included offense of the principal offense charged in the indictment can act as "an effective amendment to an indictment where the defendant actively seeks a jury instruction" on the improper lesser-included offense. Demonbreun v. Bell, 226 S.W.3d 321, 326 (Tenn. 2007) (emphasis added). However, the Defendant simply failing to object to such a jury instruction does "not constitute implicit consent to an amendment to the indictment." Gray, 2007 WL 4547970, at *14.

To support its argument, the State notes that prior to trial, trial counsel objected to the State's dismissal of the felony reckless endangerment counts. Trial counsel stated that he thought it would be "helpful to the [d]efense to show that the State [had] as a backup a lesser[-]included of reckless endangerment." The prosecutor responded that she anticipated the trial court charging reckless endangerment as a lesser-included offense. Trial counsel responded that there was "a big difference between charging it and already having it alleged by the State." The trial court overruled trial counsel's objection but allowed the presentment to be sent back with the jury so trial counsel could "point out to the jury [those] two charges [had] already been dismissed."

The Defendant never made a written or oral request that misdemeanor reckless endangerment be charged as a lesser-included offense of attempted first degree murder. When discussing the jury instructions, the trial court listed misdemeanor reckless endangerment as one of the lesser-included offenses, and trial counsel did not object. The State also supports its argument by noting that during closing argument, trial counsel referred several times to "recklessness," stated that the Defendant was only guilty of "a lesser[-]included," and stated that reckless endangerment was really what the State believed the Defendant was guilty of.

We cannot agree with the State's assertion that trial counsel's objection to the dismissal of the felony reckless endangerment charges and comments during closing argument were the same as actively seeking a jury instruction on misdemeanor reckless endangerment. The Defendant made no written or oral request for the jury instruction. Instead, he merely failed to object when the trial court erroneously instructed that misdemeanor reckless endangerment was a lesser-included offense of attempted first degree murder. Accordingly, we conclude that the judgments of conviction for all five convictions of misdemeanor reckless endangerment are void. Those convictions are reversed and dismissed.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court regarding the Defendant's convictions and sentences for attempted first degree murder and employing a firearm during the commission of a dangerous felony are affirmed. However, as we have concluded that misdemeanor reckless endangerment is not a lesser-included offense of attempted first degree murder; the Defendant's convictions for misdemeanor reckless endangerment are reversed and dismissed.

_____
D. KELLY THOMAS, JR., JUDGE